546 So.2d 1287 (1989)
Herbert McDONALD, et al.
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, et al.
No. 88 CA 0770.
Court of Appeal of Louisiana, First Circuit.
June 20, 1989.
Rehearing Denied August 17, 1989.
*1288 Gerald Talbot, New Orleans, for defendants.
Lewis Unglesby, Baton Rouge, for plaintiffs.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SHORTESS, Judge.
Illinois Central Gulf Railroad Company (defendant) appeals from a judgment against it awarding damages for property damage and mental anguish to Herbert and Faye McDonald (plaintiffs) and to Quick Stop Grocery, Inc. (Quick Stop), a corporation solely owned by them. Quick Stop is a *1289 small grocery store located directly across Highway 190 from the site of the 1982 Livingston Parish derailment of defendant's train. Also named defendants in the original petition were Elgin, Joliet and Eastern Railway Company, Edward Peyton Robertson, Jr., Janet Brumfield Byrd, and James Russell Reaves. Plaintiffs later dismissed Elgin, Joliet and Eastern Railway Company; and defendant dismissed its third party demand against Elgin, Joliet and Eastern. The other three defendants were employees of Illinois Central Gulf Railroad. Reaves and Robertson both filed answers to plaintiffs' petition; however, Byrd did not. Trial proceeded against Illinois Central Gulf Railroad, who is the only appellant before us. Defendant stipulated liability.
The trial court awarded damages of $166,811.14 to the Quick Stop, including physical damage to the premises, temporary repairs, inventory used during the evacuation of Livingston and also inventory later disposed of, labor costs, past and future loss of profits, and various miscellaneous items. It awarded $75,750.00 to Faye McDonald for her fear, worry, inconvenience, and mental and physical pain and suffering. To Herbert McDonald (McDonald), an award of $50,000.00 was made to compensate him for fear, uncertainty, inconvenience, mental pain and suffering, and mental anguish. Additionally, an award of $8,800.00 was made for property damage to plaintiffs' home near the derailment site.[1]
McDonald left home on the morning of September 28, 1982, to open the Quick Stop for business around 3:00 a.m. The store was located about 250 yards west of the derailment. At 5:15 a.m., he was waiting on a customer when he heard a train across the road making a great deal of noise. About that time, a young man came and told him to call the Sheriff's department because the train had derailed. As McDonald was reaching for the telephone book, an explosion occurred and blew out the front windows in the store. He and the customer ran to the back of the store in fright.
A fire then surrounded the area, and McDonald went to call his wife. By that time, the store was becoming crowded; McDonald testified that first a young boy came in and told him he should leave, and later an acquaintance told him he should evacuate, but he was unable to leave because his car was blocked and he did not want to leave his property. As traffic cleared, he left to get his wife, who could not leave because she had no vehicle. They left from their home without medications, glasses, or toilet articles, and went to stay with relatives. For the two weeks that the town of Livingston was evacuated, they attempted daily to get back to the store, where McDonald had left cash in the register, but were denied access.[2]
Faye McDonald testified that she heard a noise early that morning but went back to sleep; that when her husband called she was asleep; that she got up, and saw that, as her husband put it, "it looked like the whole world was on fire"; that she heard a train car venting itself; that she was more frightened of the noise than anything; that she locked the door and waited until an acquaintance came by to get her; and that at that time her husband arrived, so she got in the car with him, and they left. She also testified that she had had a nervous breakdown some ten years before the time of trial and took tranquilizers every day but had not sought any psychiatric or psychological counseling as a consequence of the derailment experience.
When plaintiffs returned to Livingston, they were at first unable to get home because the toxic readings were too high, so they spent the day at Quick Stop but were unable to open for business. It was a day or so before they found out what would be *1290 required in the way of disposal of inventory and cleanup. The store remained closed for 44 days. Plaintiffs began cleanup work the day after returning to Livingston. Mrs. McDonald spent most of her time at the house but also helped out at the store. Authorities required the McDonalds to wash down the entire store with a bleach solution and to dispose of much of the store's inventory by burying it. There was damage to the house as well as to the store. Except for the window breakage to the store which Mr. McDonald saw, plaintiffs did not or could not see the damage when it occurred.
Mrs. McDonald testified that she noticed a rash on her arms, hands, stomach, and legs almost immediately upon returning home after the evacuation; that the rash bothered her a great deal and covered her arms, stomach, hands, and legs; that she did not see her doctor for the rash until, at the earliest, June of the next year. She consulted a dermatologist, Dr. Charles Black, and was hospitalized for the condition on May 27, 1984. At that time, tests for the presence of chemicals in her bloodstream were performed and were within normal levels. She also suffered from sinusitis after the derailment, and consulted Dr. Lott for that problem in February of 1985, according to his records. No mention of sinusitis was made in the hospital records from the May, 1984, hospitalization. At the time of trial, in December of 1987, she was still complaining of sinusitis and dermatitis. Mr. McDonald had no medical complaints.
Highway 190 was closed from the date of the derailment, September 28, 1982, until November 16, 1983. On November 10, 1982, McDonald entered into a settlement with defendant for Quick Stop's incidental expenses related to the derailment, for loss of profits through November 24, 1982, and for the cost of inventory. This settlement to Quick Stop was in the amount of $39,683.70.[3] At that time, both parties had been told that Highway 190 would reopen within two weeks. McDonald testified that he was told by defendant's representatives that the road would be opened within that period, and he needed to get the business going again. He acknowledged in writing on the face of the release that it was a final settlement and release. Waymon Jobe, who negotiated the settlement for defendant, testified that his information from the state authorities supervising the cleanup of the derailment site was that the road would open in two weeks. However, he later went back to McDonald and, in his words, "voluntarily reopened" the claim, even though the railroad's attorney had told him he could stand on the release. Jobe paid Quick Stop an additional $5,000.00 on February 9, 1983, and $10,000.00 on May 11, 1983, "because he was trying to do those people right." Thus, a total of $54,683.70 was paid by defendant to Quick Stop as a result of damages allegedly caused by the derailment, and a credit in that amount was given in the judgment against defendant. The trial court found that there was a mutual mistake of fact as to when the road would open, and thus the compromise was vitiated.
Quick Stop's records, a summary of which was prepared by an adjuster for defendant, indicate an irregular decrease in business after the derailment. Plaintiffs' primary argument at trial was that because of the road closure for over a year and because of the public's perceptions that the food sold by the Quick Stop was somehow contaminated by the chemicals spilled in the derailment, the store lost business and has never recovered. Plaintiffs took over the store in 1978; their peak year for net profits was 1979, with $11,308.95; in 1980, it was $6,259.36; in 1981 it dropped; and in 1982, the year of the derailment when the store was closed for most of the last quarter of the year, net profits were $3,427.05. Because the store sold both grocery and *1291 non-food items, as well as gasoline, profit margins varied. Drake Ratcliff, the railroad's adjuster and expert testified that for the period from the derailment through the first quarter of 1983, a total of $7,180.00 in gross profits was lost. Using a different profit percentage, plaintiffs' expert economist, Dr. Randy Rice, found that the total gross profits lost for the period from the derailment through the end of 1986 were $29,984.00. The railroad's figures, extended through that period, would be $24,753.00 for gross profit loss. Dr. Rice testified that based on a theory of "parity" with the state's economyapparently a method of comparing an individual business's performance with the economy of the state of Louisianafuture loss of profits would be $81,500.00, or the $8,150.00 average loss through 1986 multiplied times ten years, with the discount and inflation rates cancelling each other out. The total loss of gross profits both past and future, was approximately $130,000.00. The trial court awarded $30,000.00 for past loss of profits and $81,500.00 for future loss of profits.
Defendant assigns twelve specifications of error, which we will group for convenience into three categories. Assignments one through three attack the damages awarded to plaintiffs for mental anguish, inconvenience, worry, and fear, on the grounds that the award was excessive and legally erroneous. Assignments four through six urge that the compromise agreement entered into between the railroad and plaintiffs is a bar to any further recovery by plaintiffs, and that McDonald presented false records to the railroad upon which the settlement was based; therefore, the "clean hands" doctrine precludes him from attacking that release. The trial court's finding that the compromise was vitiated by a mutual mistake as to when the road would open is also assigned specifically as error.
Assignments seven through twelve attack, generally, the property damage awards to Quick Stop for economic damages and property damage to the building itself. The trial court's refusal to allow defendant's expert witness, a railroad adjuster, to testify as to causation of Quick Stop's loss of profits is assigned as error, as is the allowance of an expert estimator's testimony concerning the cost of repairs to Quick Stop. Defendant also argues that the trial court erred in allowing the retail value of Quick Stop's inventory.
ASSIGNMENTS OF ERROR NUMBERS ONE THROUGH THREE
The trial court's reasons for judgment stated that Mrs. McDonald's sinusitis and dermatitis were linked by the medical evidence and her own testimony to her exposure to chemicals and increased stress following the derailment. The award of $75,750.00 was made to Mrs. McDonald for her fear experienced the morning of the derailment, the evacuation, worry, and inconvenience, and her mental and physical pain and suffering since the date of the derailment. Defendant argues that there was no evidence as to causation of Mrs. McDonald's sinusitis and dermatitis by exposure to chemicals; further, that the award to Mr. McDonald of $50,000.00, which included recovery for "the strain of trying to recover from the effect of the derailment," is erroneous as a matter of law because it encompassed mental anguish over economic loss, which is generally not recoverable under Louisiana law. Defendant also urges on appeal that both awards were clearly excessive.
We note first that the only evidence linking Mrs. McDonald's diseases to exposure to chemicals and increased stress, other than her own testimony, was Dr. Hulon Lott's testimony. Dr. Lott was her treating physician for most of her life and is also her first cousin. He testified that she was experiencing stress as a result of the derailment because she felt all their savings were gone and she did not really know how she could get out of the situation. Mrs. McDonald testified that she felt she had no choice in her life anymore; that because of the increased work hours she and her husband were putting in at Quick *1292 Stop since the derailment, she no longer had the freedom to enjoy life as she had in the past. However she had been taking a tranquilizer daily since her breakdown in the 1960's and never consulted a psychologist or psychiatrist for stress after the derailment. We also note that Dr. Lott assumed, and so testified, that Mrs. McDonald was exposed to chemicals the morning of the derailment and after the evacuation, when she returned to clean up her home and the store. Although Dr. Black, her treating dermatologist, testified that stress is a cause of dermatitis, as is exposure to a variety of chemicals or metals, he could not express any opinion as to the specific cause of Mrs. McDonald's dermatitis, for which he treated her one and one-half years after the derailment. Further, there is no evidence we have seen which indicates she had been exposed to chemicals. Dr. Lott theorized that the hospital tests were performed too long after the derailment to show any significant amounts of chemical residue present, but it is clear that it was, at the earliest, June of 1983 before the dermatitis developed, and February of 1985 before Dr. Lott's notes mention sinusitis. Lott's opinion was that her dermatitis and anxiety were both probably secondary to exposure to chemical toxins.
Louisiana law allows recovery for inconvenience and mental anguish caused by injury to one's property at a time when one is present or nearby and experiences trauma as a result. Savoie v. Deere & Company, 528 So.2d 724 (La.App. 1st Cir.), writ denied, 532 So.2d 177 (La.1988); Carroll v. State Farm Insurance Company, 427 So.2d 24 (La.App. 3d Cir.1983). More than minimal inconvenience and worry must be shown before damages may be awarded. Farr v. Johnson, 308 So.2d 884 (La.App. 2d Cir.1975). Here, the ordeal was experienced by Mrs. McDonald at her home a short distance (about a half mile) from the site. Mr. McDonald did actually witness an explosion which caused glass to break at the store. Plaintiffs were both within the "zone of danger." See Harper v. Illinois Central Gulf Railroad, 808 F.2d 1139 (5th Cir.1987), discussing Louisiana law as applicable to this same derailment situation and holding that plaintiffs, at their home more than a mile from the derailment site, were not entitled to recover "for undergoing an ordeal in progress."
We find that the trial court abused its discretion in its award of damages for mental anguish to Mrs. McDonald, and we reduce it to $30,000.00, the highest amount a reasonable finder of fact could award.
Mr. McDonald's fear experienced as a result of the derailment, and concern over the damage to his property, are also compensable as he was within the zone of danger and experienced the ordeal directly. The inconvenience he experienced during the evacuation is also compensable, since it is directly related to the derailment. Likewise, Mrs. McDonald is entitled to an award for inconvenience during the two weeks she was forced to stay with relatives during the evacuation. Both were forced out of their home by the derailment and were, even for another two weeks, compelled to spend all their time cleaning up their home and store. Thompson v. Simmons, 499 So.2d 517 (La.App. 2d Cir.1986), writ denied, 501 So.2d 772 (La.1987), An award of $5,000.00 to each plaintiff for immediate inconvenience is appropriate. The trial court's award of $50,000.00 to McDonald was an abuse of discretion. We must reduce it to the highest amount a reasonable fact finder could award which we determine to be $20,000.00.
ASSIGNMENTS OF ERROR NUMBERS FOUR THROUGH SIX
Defendant argues that because a settlement was entered into between the parties on November 10, 1982, stating on its face that it was a full and final release of any and all claims, plaintiffs are barred from any further claims. The trial court found specifically that no final settlement was ever reached by the parties. Defendant *1293 also complains that McDonald falsified his records which he submitted to the railroad as substantiation for payment of the business interruption claim, and therefore should be precluded from attacking the release. McDonald's testimony and the tax records introduced into evidence show that he did falsify his records in an attempt to obtain the retail value rather than wholesale for the destroyed inventory. We find no error in the trial court's conclusion that no final settlement was ever reached by the parties and thus do not reach the "clean hands" argument on appeal.
We do not believe, contrary to defendant's argument, that the November 10, 1982, release was a settlement of all claims because the railroad's adjuster, Waymon Jobe, paid Quick Stop an additional $5,000.00 on February 9, 1983, and later paid another $10,000.00 on May 11, 1983, testifying that he "voluntarily reopened" the claim despite his attorney's advice that he could stand on the earlier release document. This fact belies defendant's theory that the original $39,683.70 payment was only for damage to the property itself. Obviously both parties, as the trial court found, contemplated that any final release of plaintiffs' claim would have to encompass business interruption loss as well as property damage. The uncertainty as to when the road would reopen and when the situation would return to normal extended to both parties. We agree with the trial court and find no error here.
ASSIGNMENTS OF ERROR NUMBERS SEVEN THROUGH TWELVE
Defendant's remaining assignments of error concern the trial court's award of damages to Quick Stop for property damage and loss of profits. Defendant argues that no future economic loss beyond that paid by defendant was recoverable, that the award of economic damages was excessive, that its expert should have been allowed to testify concerning a possible cause of Quick Stop's loss of profits other than the derailment, and that the trial court erred in awarding more than the wholesale price of Quick Stop's destroyed inventory. Concerning the property damage award itself, defendant urges that the trial court erred in allowing an expert witness with no independent knowledge of the cost of repairs to testify based on estimates he received from subcontractors, and that the trial court erred in allowing damages for repairs to Quick Stop which included replacing structural supports which were not present in the concrete-block building before the derailment.
We first note that plaintiffs' theory of recovery for business interruption loss and for loss of future profits was that customers disappeared when the road was closed, denying them access to Quick Stop for over a year, and that public confidence in Quick Stop was eroded as a result of the chemical spill directly across the road from the premises. In support of this theory, plaintiffs called two witnesses: Dr. Randy Rice, an expert economist; and Dr. Ronald Bush, an expert in marketing. Dr. Rice expressly refused to venture an opinion as to the cause of Quick Stop's loss in profits and deferred to Dr. Bush. When asked by plaintiffs' counsel how he arrived at his ten-year projection of lost profits for plaintiffs' businessspecifically, whether he based that on McDonald's work-life expectancyDr. Rice replied that McDonald would have to talk about how long he would want to continue working. At the time of trial, McDonald was 59 years old.
Dr. Ronald Bush testified by deposition. He theorized four different variables in forming an opinion as to the impact of the derailment on various businesses. These were convenience; goods and store classification scheme (meaning that convenience goods, or low-ticket items, will be purchased by most consumers primarily based on convenience); store loyalty; and perceived risk to customersin this case, safety or health risk associated with a disaster such as the derailment. In his opinion, business firms lost sales while they were barricaded, lost customers with future sales to competitors because of the barricade, *1294 and lost or will lose future sales because of customers' fear of residual effects of the disaster. He testified, when asked whether in his opinion there was permanent damage to the businesses that cannot be turned around, "As long as a percentage of the potential customers in that area perceive there to be some risk associated with that area, then my answer would be yes." However, he had conducted no surveys in the area as to business growth or losses, customer preferences, or customer losses. When asked whether he would recommend that these particular businesses relocate, he testified that assuming a percentage of the population believes there is a residual effect from that disaster, he would advise relocation. (Emphasis supplied.)
McDonald testified that he believed he had lost about 50% of his business since the derailment because many of his customers came from Holden and communities along Highway 190. However, he had never actually measured the loss of customers. One customer, Bobby Cade, testified that he was in the habit of going to Quick Stop every morning, and now there are fewer customers than before the derailment. No testimony whatsoever was introduced as to whether a percentage of the population believed there was a residual effect from the derailment. Although the record indicates that sales declined, plaintiffs have not shown why.
Plaintiffs' primary theory of recovery was that gross profit loss resulted from the erosion of public confidence in Quick Stop because of the derailment, and from the change in traffic patterns of habitual customers who were prevented from getting to the store for the 14 months that the road was closed. To prove that theory by a preponderance of the evidence, plaintiffs needed more than an expert who theorized that if the public perceived that the store's merchandise presented a risk, then the store would and did lose customers. The record indicates that although the barricades were up on either end of the highway, it was possible to go around them to get to Quick Stop, and it was possible to get there on back streets. Plaintiffs called no customers who testified as to their perceptions about Quick Stop merchandise, or whether they found it inconvenient to get to Quick Stop and therefore ceased coming.
In Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d 387 (La.App. 2d Cir.), writs denied, 513 So.2d 826, 827, 828 (La.1987), the Court of Appeal overturned a jury award in excess of two million dollars in favor of a jewelry store which had been burglarized during the peak Christmas season. Peacock's, Inc.'s theory of damages was that to place it in the same position it would have occupied absent the burglary, it was entitled to the replacement value of all the merchandise stolen, and the gross profits, actual and projected, it lost from the date of the burglary and over the next eight years. The court held that, when it is not shown that the loss of income, more probably than not, was attributable to a defendant's fault, tort damages for loss of income for a reasonable time would not be allowed. Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d at 407.
We believe Peacock's, Inc. is controlling here. Plaintiffs attempt to rely upon City of Shreveport v. Standard Printing Company of Shreveport, Inc., 427 So.2d 1304 (La.App. 2d Cir.), writ denied, 434 So.2d 1106 (La.1983), writ recalled, 441 So.2d 737 (La.1983). Standard Printing allowed recovery in an expropriation case for a business which was relocated from downtown Shreveport and which proved, by surveys of downtown customers and by expert testimony about those surveys, that a relocation away from downtown Shreveport would result in a loss of customers. In Peacock's, Inc., like the present case and unlike Standard Printing, no customers, actual or potential, testified, and no survey was performed by an expert. Therefore, the court there concluded, Peacock's, Inc., did not prove that it sustained any damage to customer confidence. Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d at 410.
*1295 We conclude that plaintiffs did not carry their burden of proof. Without any evidence to support plaintiffs' theory of recovery, we cannot allow any further recovery for loss of profits. The trial court was clearly wrong in so allowing.
We believe that plaintiffs have been compensated by defendant for any loss of profits attributable to the derailment, for the 44 days the store was actually closed and for the first two quarters of 1983, 1984, 1985, and 1986, totaling $29,984.00. Rice projected that figure for an additional ten years from the date of trial, as we noted earlier, to reach a figure of $130,000.00 for future gross loss of profits. Since there is no proof in the record in support of these figures, we deny any further recovery because the payment made by defendant to Quick Stop reimburses plaintiffs for all their business damages.
Defendant also complains that its expert witness, Drake Ratcliff, was not allowed to testify concerning a competing store which opened in May of 1985 as a possible reason for the decline in Quick Stop's business. Because of the result we reach on the issue of causation, we need not address this assignment of error.
Defendant also urges as error the trial court's award of $22,377.89 for inventory disposed of during the evacuation, representing the retail rather than the wholesale price of the merchandise. From the record we are able to ascertain that the wholesale price would be some $4,000.00 less, or $18,000.00. Peacock's, Inc. found that at least, the proper measure of damages for the loss of an inventory is replacement cost, without reduction for depreciation. Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d at 408. Plaintiffs attempt to distinguish this by arguing that the replacement cost of groceries rose during the period the store was closed; however, no evidence was presented in support. We agree with defendant that plaintiffs should not be able to recover twice for their inventory, which they would do if they recovered retail and business interruption. In any event, we note that to the extent the trial court awarded past and future loss of income to plaintiffs, any additional sum beyond the wholesale price of the inventory was already covered in the railroad's settlement; plaintiffs have already been compensated fully.
The remaining assignments of error concern the property damage award for repairs necessary to restore Quick Stop to its pre-derailment condition. Defendant urges as error the trial court's granting an award which included repairs to the "U-block" which plaintiffs' expert testified were necessary. Quick Stop is in a concrete block building, and its foundation was cracked in the derailment explosions. Normally concrete buildings like this one are constructed with a "U-block" as support in the roof. However, defendant argues that the evidence showed that Quick Stop had no such U-block. Some repairs have been made to the building; however, disputes arose in the testimony as to whether those repairs were permanent or adequate. Plaintiffs' expert believed that to restore the building would cost $26,155.00, including re-roofing, making repairs to the U-block, masonry work, painting, repairs to the fascia and soffet, and replacing some of the blocks. Defendant's expert testified that, since the original repairs included placing reinforcing rods in the building, and there could not have been a U-block, appropriate repairs would include injecting epoxy into the cracked blocks to make them structurally stable. His estimate of repairs was $10,400.00.
The trial court was not clearly wrong in allowing the higher amount of repairs to the building. Where there is a difference in opinion between experts on a factual matter, it is within the trial court's discretion to favor one opinion over another. Anthony v. Hospital Service District No. 1, 477 So.2d 1180 (La.App. 1st Cir. 1985), writ denied, 480 So.2d 743 (La.1986). We will not disturb that finding.
Defendant's final assignment of error is that the trial court erred in allowing *1296 the testimony of an expert estimator, who relied upon the estimates of subcontractors in forming his opinion and who testified that he had a "rough idea" what repairs should cost. In Barley v. State of Louisiana through the State Department of Highways and Boh Bros. Construction Company, Inc., 463 So.2d 689 (La.App. 4th Cir.1985), the court noted that it was unable to find a civil case dealing with this issue,[4] although it was permissible in criminal cases for experts to rely on information obtained from others. Citing the Federal Rules of Evidence, Barley held that it was permissible for a contractor to rely on a subcontractor's bid in making an estimate. Barley v. State of Louisiana, 463 So.2d at 693. We agree with the trial court here that it is in the nature of an estimator's work to rely on prices obtained from other sources. Defendant argues that Gremillion, plaintiffs' expert, did not have even a "rough idea" on his own what prices should be; however, that was not Gremillion's testimony. Gremillion testified he had no exact knowledge, not that he had no knowledge at all.
We conclude that the trial court abused its discretion in its general damages award to Mrs. McDonald of $75,750.00 and to Mr. McDonald of $50,000.00. We amend the general damages to $35,000.00 to Mrs. McDonald and $25,000.00 to Mr. McDonald. We reverse the trial court's award for loss of profits in excess of the amount previously paid to Quick Stop.[5] We agree with the trial court that no final settlement was reached by means of the November 10, 1982, release because there was a mutual mistake of fact. We find no manifest error in allowing the testimony of plaintiffs' expert estimator and agree with the trial court's award of $26,155.00 for physical repairs to Quick Stop.
Accordingly, we reverse in part, amend in part, and affirm in part the judgment of the trial court. All costs of this appeal are taxed 50% to plaintiffs and 50% to defendant.
REVERSED IN PART, AMENDED IN PART, AND AFFIRMED IN PART.
NOTES
[1] Defendant has not appealed this portion of the award to plaintiffs.
[2] Eventually, a police officer retrieved the cash in Quick Stop's cash register and gave it to McDonald.
[3] A $10,000.00 advance was made on October 23, 1982, to Quick Stop. A check for $29,683.70 payable to Quick Stop was given on November 10, 1982. McDonald endorsed the check and signed a "complete" release dated that date.
[4] We note that The Louisiana Code of Evidence, art. 703, follows Federal Rule of Evidence 703 in allowing an expert witness to base his testimony on matters not within his personal knowledge. The Louisiana Code of Evidence went into effect on January 1, 1989.
[5] The settlement previously reached between defendant and Quick Stop was for a total of $54,683.70. In its reasons for judgment, the trial court awarded the following: $26,155.00 for physical damage to property, $4,000.00 for temporary repairs to the building, $908.55 for inventory used during the evacuation, $22,377.89 for inventory, $63.60 for cash register cleaning, $206.10 for dairy products disposed of during the evacuation, $1,600.00 for labor costs for cleanup, $30,000.00 for past loss of profits, and $81,500.00 for future loss of profits, for a total $166,811.14. We point out that the $22,377.89 figure was clearly wrong as it represented retail rather than wholesale cost for the inventory; we have reduced that to $18,000.00. We also have deducted $81,500.00 for future loss of profits. The remaining judgment, excluding the $26,155.00 for physical damage to property which was never paid by defendant and which we affirm, totals $54,778.25. This approximates the amount previously paid by the defendant.