581 So.2d 1013 (1991)
Jerry CUTRER and Jerry Cutrer, d/b/a G & J Drive-In, Sharon Cutrer, Donise Cutrer, Jeffrey Cutrer and Jerry Cutrer, Individually and as Administrator of the Estate of his Minor Child, Dennis Cutrer
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, Elgin, Joliet and Eastern Railway Company, Edward Peyton Robertson, Jr., Janet Brumfield Byrd and James Russell Reeves.
No. 90 CA 0088.
Court of Appeal of Louisiana, First Circuit.
May 16, 1991.
Rehearing Denied July 31, 1991.
*1015 John C. Reynolds, New Orleans, for defendant Illinois Cent. Gulf R. Co.
Mary Barrios, Lewis Unglesby, Baton Rouge, for plaintiffs, Jerry Cutrer, et al.
Before SAVOIE, CRAIN and FOIL, JJ.
SAVOIE, Judge.
This appeal presents another claim arising from the devastating Livingston train derailment on September 28, 1982. This case presents two issues: whether settlement agreements entered into between the plaintiffs and the defendant Illinois Central Gulf Company (the Railroad) extinguished the plaintiffs' causes of action; and whether the damages awarded by the trial judge were proper. We find that the settlement agreements do not bar the plaintiffs' causes of action. We further find that the trial judge's award of damages was proper as to some items and improper as to others.

FACTS
On September 28, 1982, at about 5:15 a.m., an Illinois Central Gulf (ICG) train derailed on the tracks adjacent to Highway 190 in Livingston. When the train derailed, there was an explosion and fire involving the hazardous chemicals the train was transporting.
The explosion awoke the CutrersJerry and his wife, Sharon, and their three children, Donise, Jeffrey, and Dennis. The Cutrers lived on Texas Street, about a half to five-eighths of a mile from the derailment site. After hearing the explosion the Cutrers saw a red glow in the sky near the derailment site. They immediately fled Livingston. The entire town was later evacuated, and the inhabitants could not return until October 12, 1982.
When the plaintiffs returned to Livingston, they had to thoroughly clean their home and their business, the G & J Drive-In. The G & J is a fast food sandwich shop with a separate room offering video games and two pool tables; the G & J is on Highway 1500, about 600 feet from the derailment site. The G & J was closed throughout the evacuation period and then for two more weeks afterwards while the Cutrers cleaned and repaired it and replaced the spoiled inventory.
*1016 Although the inhabitants were allowed to return to Livingston, Highway 190 remained closed due to protracted clean-up work and decontamination of the area near the derailment. The road remained closed until November 16, 1983. When Jerry Cutrer reopened the G & J on October 19, 1982, patrons could only reach the drive-in from roads to the side and rear of the business. When the business re-opened, Jerry, Sharon and Jeffrey Cutrer worked many more hours than they did before the derailment.
Because the Cutrers sustained damage to their home and business, they entered into a series of settlements with the Railroad. On October 13, 1982, the Railroad advanced Jerry Cutrer $2,000.00 as an advancement of wages and expenses incurred due to the derailment. (It is not contended that this is a final settlement). On October 22, 1982, the Railroad executed a check payable to Jerry Cutrer, d/b/a G & J Drive-In for $37,090.12. On December 8, 1982, a check for $18,175.00 payable to Jerry and Sharon Cutrer was executed. On January 26, 1983, a check payable to Jerry Cutrer d/b/a J.E.T. Amusement Co. for $37,784.00 was executed. On June 27, 1983 a check for $30,000.00 payable to Jerry Cutrer was executed. These last four checks all contained language that indicated they were final settlements. The Railroad also executed a check for $784.00 on October 20, 1982 payable to Jeffrey Cutrer and one for $784.00 payable to Donise Cutrer on November 13, 1982; these two checks bore final settlement language.
The Cutrers also received payment from their homeowner's insurance of $6,464.19 less their $250.00 deductible for damages to their home. The Railroad paid the homeowner's insurer this amount at a later date.

TRIAL
The plaintiffs filed suit seeking additional recoveries. The case went to trial before a judge against the Railroad; Elgin, Joliet and Eastern Railway Co.; and Edward Robertson.[1] Liability was stipulated.
Following trial on the merits, the judge awarded the Cutrers damages as follows:

To Jerry and Sharon Cutrer
(a) Damage to their family home $30,859.00
(b) Replacement cost less depreciation
 of G & J Drive-In
 ($115,238.00 less 1/3 depreciation)
 for a net award of $76,825.33
(c) Loss of business income $20,000.00
(d) Additional labor expended in
 mitigation of damages for
 repair work to G & J $32,850.00
(e) Mitigation labor expended in
 running the business $12,104.00 each
(f) Mental anguish, evacuation,
 and emotional distress $50,000.00 each
(g) Immediate repairs to G & J
 after the derailment $ 1,651.65
(h) Loss of inventory and supplies $ 2,854.97
(i) Equipment damage (Fresh-O-Matic) $ 564.00
(j) Motor repair $ 99.50
(k) Loss of business income for a
 75-day period during building
 demolition and construction $ 8,018.42
 (computed from plaintiffs' exhibit # 16, 1987
 income tax return utilizing schedule C gross
 income figure of $41,157.75)

The foregoing awards will be reduced by amounts previously paid by the railroad in the amount of $131,578.19.

To Jeffrey Cutrer:
(b) Expenses in mitigating damages $ 6,968.00
The foregoing awards will be reduced by
the amount of $840.00 previously paid.
To Donise Cutrer:
(a) Evacuation, mental anguish, and
 distress $10,000.00
The foregoing award will be reduced by
the amount of $784.00 previously paid.
To Dennis Cutrer:
(a) Evacuation, mental anguish, and
 distress $ 7,500.00

ASSIGNMENTS OF ERROR
From this judgment, the Railroad appeals, urging nineteen specifications of error. We summarize the Railroad's assignments of error as follows:
*1017 1. The trial court erred in finding that the settlements that Jerry, Sharon, Donise, and Jeffrey Cutrer entered into with the Railroad did not bar their claims for property damages to their business and home, business losses, and mental anguish.
2. The trial court erred in finding that the Cutrers' business losses exceeded the amount the Railroad previously paid them.
3. The trial court erred in awarding the Cutrers $20,000.00 for past loss of business income and in basing this award on net profits rather than gross profits.
4. The trial court erred in finding that the damages to the G & J Restaurant were due to the derailment.
5. The trial court erred in concluding that the G & J Drive-In was damaged so badly that it could not be adequately repaired.
6. The trial court erred in basing its award for damages to the G & J Drive-In on replacement value of the building less depreciation.
7. The trial court erred in awarding $32,850.00 for repair work to the G & J Drive-In while awarding $76,825.33 as replacement value of the building.
8. The trial court erred in awarding $8,018.42 as future loss of business income while the G & J would be demolished then reconstructed.
9. The trial court erred in finding that the damages to the Cutrer home were caused by the derailment.
10. The trial court's awards of general damages to the Cutrers were excessive.
11. The trial court erred in awarding Jerry, Sharon and Jeffrey Cutrer labor expenses because this is duplicative of the general damages award.
12. The labor expenses awards are excessive.
13. The trial court erred in assessing the Railroad with expert witness fees.

SETTLEMENT AGREEMENTS
The Railroad contends that the Cutrers' causes of action (with the exception of Dennis Cutrer's claim) were extinguished by written settlement agreements between the Cutrers and the Railroad.
According to the Railroad's documents attached to the checks payable to the Cutrers, the money represented various items of damage. The October 22, 1982 check for $37,090.00 represented lost profits from the game room and restaurant, damage to the G & J building, ruined or damaged equipment, and ruined inventory; the lost profits encompassed past lost profits and future lost profits for three months.[2] The December 8, 1982 check for $18,175.00 payable to Jerry and Sharon Cutrer represented $14,500.00 in interest lost because they had to take their house off the real estate market; $250.00 for their homeowner's insurance deductible; and $3,425.00 for repairs to their home and pool.
The January 26, 1983 check for $37,784.00 represented $20,700.00 for past and future lost restaurant profits, and $16,784.00 for lost game room profits. The June 27, 1983 check for $30,000.00 indicated that it was in addition to the January check for future loss of business.
The check for $780.00 to Jeffrey Cutrer indicated that $300.00 was for food and lodging and $480.00 was for salary. The check for $784.00 to Donise Cutrer indicates that $107.20 was for work missed, $216.00 was for lodging, $300.00 was for food, $130.00 was for clothes, and $30.80 was for miscellaneous expenses.
The trial court found that the releases did not bar the Cutrers' claims, reasoning as follows:
The Court is convinced by a strong preponderance of the evidence that Illinois Central Gulf paid to Mr. and Mrs. Cutrer the sum of $106,874.12 as advances on their business losses and damages. The releases signed by Sharon *1018 and Jerry Cutrer as relates to the business do not, in this Court's opinion, constitute a final settlement as it was based upon a continuing mutual mistaken belief that Highway 190 would reopen within a short period of time. Testimony from the representative of Illinois Central Gulf was clear that he was aware of the continuing business problems of those businesses behind the barricade. In addition, the establishment of this continuing course of business and series of transactions involving release documents and settlements drafts all containing `full and final release' language gave plaintiffs ample reason to believe that these documents were not full and final settlements.
The Court is also convinced that this particular course of dealing extends to all of the family members in the Cutrer household. There is no reason to believe that the younger Cutrers would be treated any differently than Jerry and Sharon Cutrer as relates to their dealings with the railroad, and the testimony of both Jeffrey and Donise Cutrer was clear that they did not understand the documents to be full and final releases. This is also particularly convincing in that the release was for out-of-pocket provable special damages only and included no amounts for general non-specific damages. Consequently, the Court feels that all releases filed into evidence and executed by Sharon Cutrer, Jerry Cutrer, Donise Cutrer, or Jeffrey Cutrer are of no legal force and effect; however, the defendant is entitled to a credit against any awards rendered herein. L.S.A-C.C. Art. 3081; Mooneyhan v. State Farm, 290 So.2d 405 (La.App.2d Cir.1974); L.S.A-C.C. Art. 1949; Nook[Moak] v. American Automobile Insurance Company, 242 La. 160, 134 So.2d 911 (1961); McDonald v. Illinois Central Gulf Railroad [546 So.2d 1287] [sic] (La.App. 1st Cir.1989) (CA/88/0770).
According to our Civil Code, a compromise extends only to the claims the parties intended to include. LSA-C.C. art. 3078; Moak v. American Automobile Insurance Company, 242 La. 160, 134 So.2d 911, 913 (1961). The intent of the parties in a compromise is a question of fact. See Hall v. Management Recruiters of New Orleans, Inc., 332 So.2d 509 (La.App. 4th Cir.1976). In Rosell v. ESCO, 549 So.2d 840 (La.1989), the supreme court set forth an appellate court's standard of review for questions of fact. According to Rosell,
[A] court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not complete by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong....
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to *1019 credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell, 549 So.2d at 844-45. (Citations omitted).
We cannot say that the trial judge erred in finding that the Cutrers did not believe each check to be a full and final settlement of their claims. As to the Cutrers' claims for business losses and property damage to the G & J, the Railroad's action in paying the Cutrers additional sums in October, 1982, January, 1983, and June, 1983, for damage to the G & J contradicts the Railroad's language on each check indicating it represented a final settlement. To the contrary, the Railroad's adjuster reopened the Cutrer's claim because the reopening of Highway 190 kept being delayed. McDonald v. Illinois Central Gulf Railroad Co., 546 So.2d 1287, 1293 (La. App. 1st Cir.), writs denied, 551 So.2d 1340 (La.1989). Furthermore, the Cutrers all testified that they did not understand the checks to represent final settlements.[3] We agree with the trial judge's reasoning that the Railroad's "particular course of dealing" in the unusual circumstances of this casean ongoing cleanup and decontamination conducted for over a year after the derailmentextended to all the Cutrers, invalidating the checks as final releases.
Additionally, the documentation attached to the checks shows that none of them were to recompense the Cutrers for mental anguish and suffering and inconvenience; rather, each check represented "out of pocket provable special damages" only. Because the Cutrers did not intend to release their claims for personal injury in the form of mental anguish, the releases clearly did not bar the Cutrers' claims for mental anguish. For these reasons, we find no error in the trial court's finding that the releases did not bar the plaintiffs' claims.

BUSINESS LOSS
The Railroad contends that the trial judge erred in awarding the plaintiffs $20,000.00 for business losses through trial. The Railroad cites another train derailment case, McDonald, 546 So.2d at 1294-5, to support its contention; the Railroad argues that McDonald mandates that we find the plaintiffs failed to carry their burden of proving that the derailment caused them to lose profit.
The plaintiffs in McDonald owned a convenience store, Quick Stop, adjacent to the G & J. The McDonalds claimed that they lost profit after the derailment because public confidence eroded due to the disaster and because the closure of Highway 190 changed the traffic patterns of their habitual customers, preventing them from getting to the store. This court rejected the McDonalds' theory because they did not carry their burden of proof, reasoning as follows:
To prove that theory by a preponderance of the evidence, plaintiffs needed more than an expert who theorized that if the public perceived that the store's merchandise presented a risk, then the store would and did lose customers. The record indicates that although the barricades were up on either end of the highway, it was possible to go around them to get to Quick Stop, and it was possible to get there on back streets. Plaintiffs called no customers who testified as to their perceptions about Quick Stop merchandise, or whether they found it inconvenient to get to Quick Stop and therefore ceased coming.
McDonald, 546 So.2d at 1294. The court went on to state that to recover tort damages for loss of income, the plaintiff must show that more probably than not, the loss of income was due to the defendant's fault.
We reach the same conclusion in the case at bar. Dr. Randy Rice, the expert economist who testified that the plaintiffs lost $20,000.00 in profit from October, 1982 through 1987 or 1988, refused to give an explanation for any lost profits. Jerry Cutrer testified that when the G & J was open *1020 while Highway 190 was closed, his only customers were the people cleaning up the derailment site and the truckers hauling the contaminated dirt away from the site. Jerry Cutrer said that when Highway 190 re-opened, business was the same as when the road was closed. We again note that customers had access to the G & J via other roads.
We conclude that the plaintiffs did not carry their burden of proof. With less evidence presented in this case than was presented in McDonald to show that the derailment caused the plaintiffs' loss of profits, we cannot allow any recovery for loss of profits. The trial court was clearly wrong in so doing. Because of the result we reach on the issue of causation, we pretermit the issue of using net profits as a measure of damages. We also do not reach the issue of whether the plaintiffs' claim for business losses is actually a claim for negligent interference with contractual relations.

PROPERTY DAMAGE TO THE G & J
The Railroad contends that the trial judge erred in awarding the Cutrers the cost of repairing the drive-in as well as the replacement value of the property. The Railroad contends that if the derailment caused the damages, the plaintiffs are entitled to either the repair costs or the replacement value, but not both.
We initially note that we cannot say that the trial judge erred in finding that the derailment explosions caused the damage to the G & J. The trial judge expressly stated that he believed that the crack in the slab running throughout the entire building was caused by explosions occurring following the derailment. Jerry Cutrer and two contractors who worked on the G & J before and after the derailment testified that the crack in the slab and other damage appeared after the derailment. The plaintiffs also presented the expert testimony of an engineer, James Clary. Clary believed that the crack in the slab was not due to foundation failure; additionally, because the Cutrers told him the crack was not there before the derailment, but did appear afterwards, Clary opined that the crack was due to the derailment explosions.
The Railroad presented the expert testimony of Harold Meyers and Wilfred Baker. Meyers, an engineering expert, testified that he examined the drive-in about a month after the derailment and that he found no evidence that the building was cracked in half by the derailment explosions; in his opinion, the cracks in the building were due to the foundation settling. On cross-examination, he did testify that he did not conduct measurements of the grades to determine the nature of the crack. Baker, an expert engineer with particular knowledge of blast damage, testified that he did not believe that the slab cracked due to explosions. We cannot say that the trial judge erred in accepting the plaintiffs' witness' testimony and finding that the structural damage to the G & J was due to the derailment explosions.
This court recently reiterated the standard for property damages recovery initially set forth in Carter v. Gulf States Utilities Co., 454 So.2d 817, 819-820 (La.App. 1st Cir.1984):
In determining damages, the trier of fact is accorded much discretion, especially where the facts of the case preclude a precise computation of damages.... No mechanical rule of determining damages is to be applied; the quantum in each case must be determined considering the facts and circumstances of that case.... Although trial judges are granted great discretion in determining damage awards, these awards must be made in accordance with law.... The proper goal of a damage award is to restore the plaintiff, as closely as possible, to the position which he would have occupied had the accident never occurred....
Generally, three approaches have been followed by the Louisiana courts in arriving at the amount of damages to property; (1) the cost of restoration if the thing damaged can be adequately repaired; (2) the difference in value prior to and following the damage; or (3) the cost of *1021 replacement new, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined, or if the cost of the repairs exceeds the value of the thing damaged.
Mouton v. State of Louisiana, 525 So.2d 1136, 1143 (La.App. 1st Cir.), writ denied, 526 So.2d 1112 (La.1988).
The trial judge found that the derailment explosions damaged the G & J and that the building could be put in a usable condition but could not be restored to its original condition. The judge then awarded the replacement value of the building less a reasonable depreciation.
While the Railroad's contention that the trial judge erred in finding the G & J's damage was due to the derailment has no merit, we do believe that the Railroad's contention that the property damages awarded to the plaintiffs were excessive has merit. The trial judge was entitled to award the plaintiffs the cost of replacement new of the G & J, less reasonable depreciation, because the cost of the repairs exceeded the value of the thing damaged. Mouton, 525 So.2d at 1143. Two different contractors testified that the only way to fix the cracked slab was to tear down the building and replace the slab; estimates for this work were $115,000.00 and $115,238.00. Clearly, this cost of repair exceeded the value of the building. However, while the trial judge was entitled to award the plaintiffs the $74,825.33, he could not also award them $32,850.00 for temporary repair work because the plaintiffs were mitigating their damages. The $32,850.00 represented repair work to the roof which had serious leaks after the derailment; apparently the trial judge felt that by having the temporary repair work performed, the G & J could remain open despite its cracked slab. Yet, the trial judge also awarded the plaintiffs the business income they will lose when the G & J is demolished and reconstructed in an amount of $8,018.42. We do not feel the plaintiffs mitigated their damages by paying $32,850.00 for repairs when the only profit the G & J would lose by closure due to demolition is $8,018.42. Furthermore, to repair the slab, according to the plaintiffs' testimony, the entire building must be torn down, including the unrepaired roof; thus, essentially the defendant Railroad would be paying twice for the repair of the roof. For these reasons, we find that the trial judge correctly awarded the plaintiffs $76,825.33 as the replacement value of the building; however, we find the trial judge erred in awarding the plaintiffs $32,850.00 for previous repairs.
Additionally, we find that the trial judge erred in awarding the Cutrers $8,018.42 for lost income while the G & J is demolished. According to the plaintiffs' 1987 income tax return, the gross income from the G & J was $41,157.75 and the net profit was $8,010.82. The trial judge apparently awarded the Cutrers the gross profit they would lose for the seventy-five days the G & J would be closed during demolition and rebuilding. However, because the drive-in would be closed during the demolition, we do not believe that the plaintiffs will incur their normal overhead expenses such that the loss of net profits would be the proper measure of damages. See Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d 387, 407 (La.App. 2d Cir.), writs denied, 513 So.2d 826, 827, 828 (La. 1987); Rosenblath v. Louisiana Bank & Trust Co., 432 So.2d 285, 289 n. 3 (La.App. 2d Cir.1983). Therefore, we reduce the plaintiffs' future lost profits award to $1,668.92.[4]

PROPERTY DAMAGE TO THE CUTRER HOME
The trial judge found that the plaintiffs proved by a preponderance of the evidence that their home, bathhouse, and pool sustained structural damages totalling $29,444.75. The Railroad contends that the trial judge erred in finding that the derailment caused these damages because the plaintiffs' expert engineer, Clary, had no clear recollection of the Cutrer home at *1022 trial such that his opinion on the cause of the damages would be entitled to no weight. The Railroad further contends that the repair work on the Cutrer home performed by James Duffy, a contractor, was done so many years after the derailment that the damages could not have been caused by it. Finally, the Railroad argues that the testimony of its explosions expert, Baker, and the Gulf South Research Institute Report show in part that the Cutrer house was outside the zone of structural damage from the derailment.
We have thoroughly reviewed the testimony concerning the damage to the Cutrer home and we cannot say that the trial judge was clearly wrong in finding that the damages were due to the derailment. Duffy testified that he performed work on the Cutrer home before the derailment, and at that time he did not observe the damages he repaired after the derailment. Both Jerry and Sharon Cutrer testified that the damages were present only after the derailment. The Railroad's assignment of error has no merit.

LABOR EXPENSES AWARD
The Railroad contends that the trial judge erred in awarding Jerry and Sharon Cutrer $12,104.00 each and Jeffrey $6,968.00 for labor expenses for a period of one year after the date of the accident for clean-up expenses and operation expenses for the business.
While we agree that the plaintiffs were entitled to the additional labor they expended at the G & J due to the derailment, we find the trial judge erred by not deducting from the awards to Jerry and Sharon Cutrer the amounts representing the time they normally spent at the G & J prior to the derailment. Sharon Cutrer testified that she worked at the G & J for 3 to 4 hours three days a week before the derailment; Jerry Cutrer testified that he worked at the G & J for 4 to 5 hours daily before the derailment. We thus deduct $6,445.40 from the total business expenses awarded Jerry and Sharon Cutrer, since they would have done the work represented by this amount regardless of the derailment.[5]

MENTAL ANGUISH
The Railroad contends that the trial judge's awards for mental anguish and inconvenience to the Cutrers are excessive. In awarding Jerry and Sharon Cutrer $50,000.00 each, the trial judge explained that during the evacuation, they experienced extreme family upheaval, distress and mental anguish; he further explained that when they returned to Livingston after the evacuation, observing the damage to their home and business was stressful to them. Additionally, he noted that their husband-wife relationship during the fourteen month decontamination period was difficult and that the additional hours they worked at the G & J produced stress which almost led to the breakup of their marriage. Because of the marital problems, the judge distinguished this case from McDonald, and awarded higher amounts for mental anguish and inconvenience.
In McDonald, this court reduced the trial court's awards of $75,500.00 and $50,000.00 to Mrs. and Jerry McDonald respectively to $30,000.00 and $20,000.00, respectively, finding that the trial court had abused its discretion. We likewise find that under the facts and circumstances of this case the trial judge abused his discretion in awarding the Cutrers $50,000.00 each for their mental anguish and inconvenience. Reck v. Stevens, 373 So.2d 498 (La.1979). While the Cutrers experienced real inconvenience and fear when they evacuated their home and changes in their lifestyle when they worked extra hours at the G & J, we find their situation very similar to the McDonalds. As with Mrs. McDonald, Sharon Cutrer's biggest change in her lifestyle was her increased hours at the G & J; Mrs. Cutrer testified that this gave her less time to spend with her children, who were 19, 18, and 12 at the time of the derailment. Besides the extra work he had to perform *1023 at the G & J, Jerry Cutrer testified in more detail about the effect the disaster had on the family. According to Jerry, he, his wife, and his older son, Jeffrey, argued "a lot" after the derailment, and they were very tired with no family life. While the disruption of the family unit is a distinction from the McDonald case, we feel it was an abuse of discretion for the trial judge to make awards which are $20,000.00 to $30,000.00 higher than what was awarded in McDonald. We find that the highest amounts which could reasonably be awarded within the trial court's discretion are $35,000.00 each to Mr. and Mrs. Cutrer. See Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976).
We have thoroughly reviewed the record as to the awards made to the Cutrer children and find no abuse of the trial court's discretion. As the trial judge pointed out in his reasons for judgment, the children were forced to leave their home for a two week period with only the clothes on their back and with the uncertainty of not knowing when they would be able to return. Donise Cutrer had to continue attending school at Southeastern Louisiana University during the evacuation. When the family returned to Livingston, the children were all forced to take a more active role in operating the G & J Drive-In, particularly Jeffrey. For these reasons, we cannot say that the trial judge abused his discretion in his general damages awards to the Cutrer children.

EXPERT WITNESS FEES
The Railroad contends that the trial court abused its discretion in assessing expert witness fees against the Railroad because the damages about which the experts testified either were already compensated by the Railroad or were released by the plaintiffs.
We disagree with the Railroad's contention. We have already found that the trial court did not err in awarding total damages greater than what the Railroad already paid and that the trial court did not err in finding that the releases did not bar the plaintiffs' claims. Generally, costs are taxed against the losing party, and this was appropriate in this case. LSA-C.C.P. art. 1920.
For these reasons, the judgment of the trial court is amended to delete the $20,000.00 for loss of business income and the $32,850.00 for repairs to the G & J. The judgment is further amended to reduce the awards to Jerry and Sharon Cutrer for labor at the G & J from $12,104.00 each to a total of $17,762.60; to reduce the awards of $50,000.00 each to Jerry and Sharon Cutrer for mental anguish to $35,000.00 each; and to reduce the award for loss of business income from $8,018.42 to $1,668.92. In all other respects, the trial court's judgment is affirmed. Costs of this appeal to be borne equally by the plaintiffs and the Railroad.
AFFIRMED IN PART, AMENDED IN PART, AND AS AMENDED, AFFIRMED.
NOTES
[1] The plaintiffs initially filed suit against the following defendants: Illinois Central Gulf Railroad Co. (ICG), operator of the railroad train; Elgin, Joliet and Eastern Railway Company, owner of the railroad train cars; Edward Robertson, an employer of ICG who was in charge of the train; and Janet Brumfield Byrd and James Russell Reeves, operators of the train. ICG, Robertson, Reeves, Elgin, Joliet and Eastern Railway Company all answered the petition. According to the trial judge's written reasons for judgment, the case went to trial against ICG; Elgin, Joliet and Eastern Railway Co.; and Robertson; the trial judge stated that Janet Byrd had not been served. No mention was made of Reeves.

We note, however, that the final judgment is only against the defendant Railroad, ICG.
[2] The amounts for each specific item of damage were as follows: $10,770.00 for lost profits from the game room; $1,651.65 for building damage; $564.00 for ruined Fresh-O-Matic; $99.50 for ice machine repairs; $2,854.97 for ruined food; $9,260.00, $6,945.00, and $6,945.00 for past and future lost restaurant profits.
[3] Parol evidence is admissible on the issue of the intent of the parties in executing a compromise agreement where the parties dispute exactly what matters were intended to be settled by the compromise agreement. Smith v. Leger, 439 So.2d 1203 (La.App. 1st Cir.1983).
[4] Plaintiffs' net profit for 1987 was $8,010.82; we calculated the 75 day lost profit as follows: $8,010.82 ÷ 12 months = $667.57 $667.57 × 2½ months = $1,668.92
[5] We reach the $6,445.40 by multiplying the minimum wage Dr. Rice used by the time Jerry and Sharon worked prior to the derailment.