CARAWAY, J.
_|jln this case, the trial court ruled that separate acts by two tortfeasors at different locations combined simultaneously to contaminate a rural water system with a chemical herbicide. The trial court found the owner of the water system and. the user of the herbicide jointly at fault in a class action involving plaintiff customers of the water system whose use of water was interrupted for 8 days. These plaintiffs, fortunately, were upstream from the contamination site so that their water was ultimately shown to have not been contaminated. The trial court found the two tort-feasors jointly liable and apportioned fault. The plaintiffs were awarded economic damage only for the loss of use of their water. All sides appeal, and for the following reasons, we affirm.

Facts

On February 16, 2006, Walnut Bayou Water Association, Inc. (“Walnut Bayou”), employees were making repairs to its rural public water supply system near Delta, Louisiana, in Madison Parish. The company gave no notice to its customers that the *1108 water would be shut off. At the same time, and unbeknownst to Walnut Bayou, Fifth Louisiana Levee District (“Levee District”) employees were attempting to draw water from a Walnut Bayou customer’s nearby home located on Willow Glen Plantation to mix with a tank of acid (2, 4-D) primarily used to prevent and kill weeds. As Walnut Bayou began to empty the water lines for the repairs, the water pressure dropped to nearly zero. As a result, the drop in water pressure in the water lines inadvertently pulled from the Levee District’s tank of | ^concentrated 2, 4-D, and the acid was released into the Walnut Bayou water system. Neither the customer meter nor the faucet was equipped with devices to protect against backflow into the Walnut Bayou water lines. Likewise, the Levee District’s tank was not equipped with a backflow prevent-er.
As a result of this event, the Walnut Bayou drinking water supply was contaminated with the weed killer. Walnut Bayou supplies water to approximately 1,300 customers in Madison and East and West Carroll Parishes. The contamination was not discovered until five days after the event, on February 21, 2006. Some customers became alarmed when they saw foam in their drinking water. Subsequently, customers were instructed by the Office of Public Health to cease using the water until further notice, as the water they had been using during the 5-day period had been dangerously contaminated. State officials also told customers to not use the water for drinking, cooking, washing, doing laundry, etc. until the lines were completely cleaned. The entire system was effectively shut down for eight days, from February 21 to March 1, 2006. On March 1, 2006, tests for contamination came back negative, and Walnut Bayou’s customers were informed that the water was safe to use.
This mass tort action was subsequently filed, and numerous customers joined to sue the Levee District and Walnut Bayou. St. Paul Fire and Marine Insurance Company (“St. Paul”), the alleged insurer for the Levee District, was also named in the suit. The plaintiffs alleged that the defendants were liable for negligence in failing to take precautionary | oineasures, and Walnut Bayou was liable for breach of its contract to supply potable water.
Several years after the contamination, experts discovered that the water lines had not been completely contaminated. Accordingly, the plaintiffs were divided into two groups: the “downstream” plaintiffs who had actually received and likely consumed the contaminated water, and the “upstream” plaintiffs who initially believed they had been using contaminated water, but whose lines were not contaminated.
Prior to trial, Walnut Bayou settled with all downstream, as well as upstream, plaintiffs. The Levee District settled with all downstream plaintiffs. The only remaining claims were those of the upstream plaintiffs against the Levee District. In all, there were 141 remaining plaintiffs (hereinafter the “Plaintiffs”).
The Plaintiffs dropped their claims for personal physical injury in light of the experts’ reports. They continued, to assert claims for: (1) economic loss resulting from the water being unusable for eight days, i.e., the cost of bottled water and restaurant meals, (2) inconvenience from not being able to use water at home and, more precisely, compensation for time and energy to go other places to shower, do laundry and cook, (3) mental anguish from fear over their health and their families’ health, which caused them concern for years, and (4) the long-term anxiety and economic loss. They claim that they are not completely reassured that their water *1109 was not contaminated, and as a result are still unwilling to use tap water for drinking and cooking, resulting in an ongoing expense of bottled water.
DFoIIowing a defense motion for partial summary judgment, the trial court concluded that the Plaintiffs could recover only for economic loss, denying Plaintiffs’ claims for mental anguish, immediate or long term, or for the resultant “long term” economic loss. The February 26, 2013, partial summary judgment dismissed the claims of the Plaintiffs for mental anguish and emotional distress.
In advance of trial, the parties agreed that the court could randomly select five bellwether plaintiffs whose cases would be tried in a consolidated proceeding with the court given allowance to determine the dollar amount of a typical or representative damage award. Once the five cases were resolved, the remaining Plaintiffs were given the option of accepting the amount awarded to the bellwether plaintiffs or demanding separate trials to establish their specific damages. The trial court’s determination of fault and its allocation was stipulated to be a final judgment as to all Plaintiffs.
The five cases were tried. Plaintiffs asserted that under the Louisiana Public Health Sanitary Code, specifically Part XII (formerly Chapter 12), all “bubble tanks” like the ones being used by the Levee District to extract water from a faucet are required to be equipped with a backflow prevention device at the connection to the faucet, as well as an air gap device at the inlet of the tank. Plaintiffs presented evidence of economic loss and inconvenience incurred during the eight-day period water was unavailable. When the Plaintiffs attempted to introduce evidence of mental anguish and long-term economic loss, the trial court excluded it or stated that no weight | ¡would be given to it. At the trial’s conclusion, the court allocated 75% of the fault to the Levee District and 25% to Walnut Bayou. An award of $600 in total economic and inconvenience damages was granted to each bellwether plaintiff along with interest and costs.
All parties appealed, asserting various assignments of error.

Discussion

I.
The first arguments raised by both the Levee District and St. Paul seek a reversal of the trial court’s finding of fault by the Levee District. The arguments, however, do not question the lack of a backflow preventer or the need for such device either on the tank or on the faucet where the water was drawn. Instead, the Levee District and St. Paul argue that the Plaintiffs’ claims are not within the scope of the Levee District’s duty. The Levee District points to the fault of Walnut Bayou and asserts that “because Walnut Bayou shut down its system and failed to tell anyone,” the Plaintiffs’ inconvenience “is not within the scope of duty owed by the Levee District.” St. Paul places emphasis on the Louisiana Supreme Court ruling in PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La.1984), for its legal cause argument. Additionally, St. Paul, in its separate brief, argues that the absence of physical damage to Plaintiffs’ property defeats their claim in tort.
In negligence cases, the duty-risk analysis is employed to determine whether liability exists under the facts of a particular case. Under this analysis, a plaintiff must prove that the conduct in question was a | ficause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by *1110 the duty breached. LeJeune v. Union Pacific Railroad, 97-1843 (La.4/14/98), 712 So.2d 491. The element of duty is a question of law. Century Ready Mix Corp. v. Boyte, 42,634 (La.App. 2d Cir. 10/24/07), 968 So.2d 893. The inquiry is whether a plaintiff has any law — statutory, jurisprudential, or arising from general principles of fault — to support his or her claim. Hardy v. Bowie, 98-2821 (La.9/8/99), 744 So.2d 606; Manno v. Gutierrez, 05-0476 (La.App. 1st Cir. 3/29/06), 934 So.2d 112.
Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. Manno, supra. Whether the defendant’s conduct was a substantial factor in bringing about the harm, and thus, a cause-in-fact of the injuries, is a factual question to be determined by the fact finder. Bonin v. Ferrellgas, Inc., 03-3024 (La.7/2/04), 877 So.2d 89, 94.
The critical inquiry in the duty-risk analysis is whether the risk of the injury sustained by the plaintiff was within the ambit of the duty imposed on the defendant. There must be an ease of association between the injury and the rule of law giving rise to the duty. Cay v. State, Dept. of Transp. & Dev., 93-0887 (La.1/14/94), 631 So.2d 393, 399, citing Hill v. Lundin & Asso., Inc., 260 La. 542, 256 So.2d 620 (La.1972).
Rules of conduct are designed to protect some persons under some circumstances against some risks. PPG Industries, supra at 1061, citing Malone, Ruminations on Cause-in-Fact, 9 Stan. L.Rev. 60 (1956). Policy considerations determine the reach of the rule, and there must be an ease of association between the rule of conduct, the risk of injury, and the loss sought to be recovered. Hill v. Lundin, supra; PPG Industries, supra.
The ease of association inquiry encompasses the idea of foreseeability, but is not based on that factor alone. Holloway v. Midland Risk Ins. Co., 33,026 (La.App. 2d Cir. 5/15/00), 759 So.2d 309, 313, citing Roberts v. Benoit, 605 So.2d 1032 (La.1991). That a risk may foreseeably arise from certain conduct, does not mean that the risk falls within the scope of the duty. That a risk may not be foreseeable does not mean that it is excluded from the scope of the duty. Hill v. Lundin, supra.
First, we find that the Levee District’s scope of duty argument is misplaced. Its focus on the concurrent fault of Walnut Bayou is misdirected. The comparative fault regime of this state requires that one actor’s careless disregard of the risk not be used to formulate a conclusion that the defendant is free from fault for its separate acts. Robertson v. State ex rel. Dept. of Planning & Control, 32,309 (La.App. 2d Cir. 12/10/99), 747 So.2d 1276; Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988); Cay, supra. In other words, it cannot simply be said that Walnut Bayou’s knowledge of the risk and its failure to notify its customers renders the Levee District free from fault.
The Levee District’s duty is determined by the standard of care which it owed to all potential plaintiffs. Murray, supra. That duty was. to act reasonably regarding the herbicide and its employment by the use of the | «Levee District’s tank. The mixing of the herbicide with water necessarily involved the use of the public water system in this instance. The need for the backflow preventers at the faucet and on the tank is not contested by the Levee District and St. Paul in their arguments to this court and therefore a breach of duty occurred.
Regarding the scope of duty inquiry, the defendant in PPG Industries, supra, was *1111 dredging a river and negligently encountered and damaged a natural gas pipeline owned by Texaco. The plaintiff was a natural gas customer of Texaco and sued the defendant for higher costs of obtaining natural gas elsewhere while the pipeline was repaired. Citing policy grounds and finding no ease of association between plaintiffs loss and defendant’s duty regarding its dredging activity, the court stated its reason for the dismissal of plaintiffs claim as follows:
It is highly unlikely that the moral, social and economic considerations underlying the imposition of a duty not to negligently injure property encompass the risk that a third party who has contracted with the owner of the injured property will thereby suffer an economic loss.
Id. at 1061.
Contrary to St. Paul’s argument, the similarity between a gas pipeline customer and water system customers does not make the PPG ruling controlling in this case. This is because the Levee District’s duty specifically concerns' the need for backflow prevention to protect a water system and its customers. In contrast to the dredging company’s inadvertent act of negligence, the Levee District intentionally conducted its actions with the herbicide in a manner which directly involved a water system, |9unprotected by a backflow pre-venter. The ease of association between the duty for such protection and the Plaintiffs’ injuries is clear. The trial court’s finding of the Levee District’s fault properly determined the scope of its duty in this case.
Next, the lack of physical property damage to the water system inside Plaintiffs’ homes does not mean that no tort liability is present. Defendants argue that because there was no physical damage suffered by the plaintiffs, they should not be able to recover. However, this court has held that damages for loss of use of property are recoverable in a tort action, but only for the time reasonably necessary to restore the property. Peacock’s, Inc. v. Shreveport Alarm Co., 510 So.2d 387 (La.App. 2d Cir.1987), writ denied, 513 So.2d 826, 827 (1987). See also, McDonald v. Illinois Cent. Gulf R. Co., 546 So.2d 1287 (La.App. 1st Cir.1989), writ denied, 551 So.2d 1340 (La.1989) (where plaintiffs were forced to evacuate their homes for two weeks following a train ■ derailment near their home and awarded damages for the inconvenience of having to stay somewhere else). In the present case, although Plaintiffs suffered no physical damage to their property, they were left without use of the water supply in their homes for eight days, followed by an extended period of not definitively knowing whether the plumbing systems in their homes had been contaminated. We find that although there was no physical damage suffered, the loss of use of property in this case resulted in an economic loss to Plaintiffs that is recoverable in tort. The trial court’s finding of the Levee District’s fault properly accounted for this economic damage.
JiijII-
The second issue concerns the trial court’s finding of fault on Walnut Bayou. Plaintiffs assert that Walnut Bayou was not at fault and that 100% of the fault should be placed on the Levee District.
Walnut Bayou’s fault is likewise based upon its responsibility concerning backflow preventer devices. The evidence revealed that the Louisiana Plumbing Code requires water district customers to use air gap devices and backflow prevention mechanisms. Water supply companies are given the authority to enforce this requirement by refusing service to customers who fail to install the necessary devices.
*1112 Additionally, the Levee District argues that Walnut Bayou’s failure to notify customers of its repair work and the expected loss of water pressure breached its duty to its customers.
In its written ruling, the trial court found that Walnut Bayou’s failure to require customer backflow preventer devices and to notify its customers of the repair work was sufficient for a finding of fault. Certainly, for customers near the work site and customers engaged in farming activities, these duties on the part of Walnut Bayou to monitor and act were owed. The recognition of the need for backflow protection in the Plumbing Code demonstrates that such a monitoring duty placed upon Walnut Bayou is required and reasonable. Accordingly, the trial court’s finding of fault for Walnut Bayou’s breach of these duties is not manifestly erroneous.
III.
Both sides also dispute the trial court’s allocation of fault, 75% to the _Lu'Levee District and 25% to Walnut Bayou.
When evaluating comparative fault between multiple tortfeasors, Louisiana courts have adopted an analysis of the so-called “Watson factors.” Such an analysis includes: 1) whether the conduct resulted from inadvertence or involved an awareness of the damages; 2) how great a risk was created by the conduct; 3) significance of what was sought by the conduct; 4) the relative capacities of each, whether superior or inferior; and 5) any extenuating circumstances which might have required the individual to proceed in haste, without proper thought. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). The trier of fact’s allocation of fault is a factual determination subject to the manifest error rule. Hundley v. Harper Truck Line, Inc., 28,613 (La.App. 2d Cir. 9/25/96), 681 So.2d 46.
The Levee District’s use of the chemical herbicide charged it most directly with the knowledge of the risks of its misuse. Therefore, the Levee District upon handling the chemical had the awareness of the dangers as the events unfolded. In that same role as the handler of the chemical product, the Levee District was in the superior position with the capacity to guard against the product’s misuse. Accordingly, we find that the trial court’s placement of the greater amount of the fault upon the Levee District for this accident is supported by the evidence and presents no manifest error.
IV.
The next issue raised by Plaintiffs concerns the trial court’s partial summary judgment ruling[1] denying the Plaintiffs’ claim for nonpecuniary | ^damages for mental anguish. The Plaintiffs effectively admitted that no contaminated water had been ingested by them as upstream users of the water system. They did not receive personal physical injury from the Levee District’s tortious conduct. Under these circumstances, Plaintiffs are therefore claiming negligent infliction of emotional distress (“NIED”).
Recently, this court reviewed a NIED claim and the Louisiana jurisprudence for such claim. Covington v. Howard, 49,135 (La.App.2d Cir.8/13/14), 146 So.3d 933, writ denied, 14-1927 (La.11/21/14), 160 So.3d 973. Discussing the leading Louisiana Supreme Court case, Moresi v. State, through Dep’t of Wildlife & Fisheries, 567 So.2d 1081 (La.1990), we found that the *1113 jurisprudence has “limited recovery for NIED to those cases that involved facts where the defendant’s conduct was outrageous or deemed outrageous because the defendant breached a special direct duty to the plaintiff and where the resulting mental distress the plaintiff suffered was easily associated with the defendant’s conduct.” Covington v. Howard, supra at 938. We summarized the NIED cause of action as follows:
The common thread of the special circumstances NIED cases collected in Moresi is that each of those cases present facts proving that the defendant’s act created a very strong and obvious likelihood that the plaintiff would suffer genuine and severe mental distress. Typically, the defendant’s conduct under the circumstances is deemed so unconscionable or outrageous such that a person of ordinary sensibilities would suffer genuine and severe emotional distress. However, the phrase “special circumstances” is not necessarily limited to objectively “outrageous” conduct, such as when the defendant owes the plaintiff an independent, direct duty, and his breach of that duty is deemed unconscionable or outrageous under the circumstances, or when a defendant knew or should have known that the plaintiff was particularly vulnerable to emotional distress from his act. “[UJnless the actor has knowledge of the plaintiffs particular susceptibility to [^emotional distress, the actor’s conduct should be judged in the light of the effect such conduct would ordinarily have on a person of ordinary sensibilities.” The defendant’s knowledge that a plaintiff is particularly susceptible to emotional distress is a factor to be considered.
Covington v. Howard, supra at 940. (Citations omitted.)
In this case, both tortfeasors’ inactions regarding the water system’s safety combined in a unique event where a sudden and drastic drop in water pressure occurred. We do not find in this setting that the Levee District’s negligent conduct meets the NIED criteria. Its inaction regarding safeguards for the handling of the chemical herbicide did not create a very strong and obvious likelihood that plaintiffs throughout the entire water system would suffer genuine and severe mental distress. We, therefore, affirm the trial court’s summary judgment determination that the Plaintiffs’ claims for mental anguish should be dismissed.
V.
Finally, Plaintiffs argue that the $600 award rendered by the trial court is too low. As reviewed above, this award is purely economic, based on Plaintiffs’ expenses for inconvenience and loss of use of the drinking water supply. The trial court awarded Plaintiffs damages for inconvenience in the amount of $50 per day for ten days. The trial court considered the inconvenience of travel, including trips to laundry facilities, daily trips to the homes of friends for personal hygiene care and bathing and daily trips to purchase bottled water. Several of the Plaintiffs testified that they continued to travel to friends’ houses for use of water beyond the initial eight days because of their fear associated with using water from the Walnut | uBayou system. Additionally, the trial court awarded $100 to each plaintiff for direct expenses for the cost of additional water supplies. As indicated above, loss of use of property allows for economic recovery in tort. The trial court’s award was based upon its assessment of these factors causing added expense to Plaintiffs. We find no manifest error in the trial court’s ruling regarding these damages.

*1114
Conclusion

For the foregoing reasons, we affirm the trial court’s judgment. Costs of this appeal in the amount of $370.50 are assessed to the Levee District in accordance with La. R.S. 13:5112.
AFFIRMED.

. This ruling remained viable for review in this appeal since neither party sought certification of the judgment for appeal pursuant to La. C.C.P. art. 1915(B).