# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-903


**JOSHUA L. ADAMS, ET AL.**

**VERSUS**

**UNION PACIFIC RAILROAD COMPANY, ET AL.**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 14-C-3165-B
HONORABLE A. GERARD CASWELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## CANDYCE G. PERRET
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Candyce G. Perret, and Jonathan W. Perry, Judges.


**AMENDED AND, AS AMENDED, AFFIRMED.**

**Kenneth Warren DeJean**
**Attorney at Law**
**Post Office Box 4235**
**Lafayette, LA 70502**
**(337) 235-5294**
**SPECIAL MASTER**

**William H. Howard, III**
**Alissa A. Allison**
**Kathlyn G. Perez**
**Laura E. Carlisle**
**Baker, Donelson, Bearman, Caldwell,**
**& Berkowitz, P.C.**
**201 St. Charles Avenue, Suite 3600**
**New Orleans, LA 70170**
**(504) 566-5200**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Union Pacific Railroad Company**

**H. Alston Johnson, III**
**Steven J. Levine**
**Paul LeBlanc**
**John B. Shortess**
**Phelps Dunbar, LLP**
**Post Office Box 4412**
**Baton Rouge, LA 70821-4412**
**(225) 346-0285**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Union Pacific Railroad Company**

**Antonio M. Clayton**
**Clayton, Frugé & Ward**
**3741 Highway 1 South**
**Port Allen, LA 70767**
**(225) 344-7000**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Union Pacific Railroad Company**

**Elena A. Pecoraro**
**Grant F. Freeman**
**Anna M. Grand**
**Pecoraro Law Firm**
**95 Woods Crossing, Suite 100**
**Lafayette, LA 70508**
**(337) 266-2233**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Union Pacific Railroad Company**

**D. Blayne Honeycutt**
**Colt J. Fore**
**Hannah Honeycutt Calandro**
**Fayard & Honeycutt**
**519 Florida Avenue, SW**
**Denham Springs, LA 70726**
**(225) 664-0304**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **Charlene Brown**

**PERRET, Judge.**

This case is one of several stemming from a train derailment in Lawtell, Louisiana ("Lawtell Derailment") and those injuries suffered by members of the surrounding community. Defendant-Appellant Union Pacific Railroad Company ("Union Pacific") appeals the trial court judgment that awarded Plaintiff, Charlene Brown, damages in the amount of $6,400.00. For the following reasons, we amend the award to $2,200.00 and affirm as amended.

**FACTUAL AND PROCEDURAL BACKGROUND:**

On August 4, 2013, a train derailed near Lawtell, Louisiana. Twenty-six railcars[1] derailed, causing lube oil, dodecanol, and sodium hydroxide solution (also referred to as sulfidic caustic solution), to spill from three of the derailed train cars onto the land and into a nearby drainage ditch. The other derailed cars also contained chemical substances, including vinyl chloride. The derailment prompted a one-mile radius evacuation zone that remained in effect until August 7, 2013. Many of those evacuated were directed to Evangeline Downs and were housed there at the hotel for several days.

Multiple residents, including Plaintiff, Charlene Brown, filed suit on July 11, 2014, against Union Pacific. In the April 1, 2016 case management order, all cases pending in the Louisiana Twenty-Seventh Judicial District Court related to the Lawtell Derailment were consolidated into one division for the purpose of determining liability. Union Pacific stipulated to liability on September 12, 2016, but reserved its causation and damages defenses.

---

[1] Union Pacific's brief refers to only twenty-three train cars derailing. However, the evidence suggests that an updated report from Union Pacific indicated that twenty-six train cars derailed.

On February 8, 2017, the trial court appointed Kenneth DeJean as Special Master to preside over the causation/damages trials of the pending claims pursuant to La.R.S. 13:4165.[2] The cases were not consolidated and, therefore, each plaintiff's case was tried separately and resulted in separate judgments.

Ms. Brown presented her case-in-chief on June 27, 2017. Union Pacific presented its case on June 27-28, 2017. The Special Master issued his report and recommendation on Ms. Brown's case on October 11, 2017. The Special Master's report summarized Ms. Brown's testimony as follows (citations to the record omitted):

> Charlene Brown testified that at the time of the derailment, she was living at 119 McClendon Road, Opelousas, Louisiana, 70570 with her daughter, Lillian Frederick, and John Simien, Sr. At the time of the derailment, she was in her house and heard a loud noise. She then grabbed her shopping list off her refrigerator, got in her car and left her house to head to Opelousas to run some errands and as she was driving away, she saw the derailment. She testified that she panicked when she saw the derailment. She testified that when she drove by the derailment site on the date of the derailment, she saw "like a fog." She testified that when she was leaving her house after the derailment she could smell something. She said it smelled like acid or something burning and her eyes started burning and got red. As a result, she bought and applied some Visine in Opelousas which made the irritation to her eyes subside. She testified that her eyes burned for about 10-15 minutes. She testified that after the derailment, she began suffering from sinus infections.
>
> She was evacuated for three days as a result of the derailment. At the time she left home, after the derailment had occurred, she did not have her heart medicine with her. After she was evacuated, she called John Simien, Sr. and asked him to pick up Lillian from their house and to pick up her heart medicine. She now always keeps her heart medicine on her body. Besides her heart medicine, at the time she was told by the state trooper that she could not go back home, she

---

[2] The appointment of a special master may be made "[p]ursuant to the inherent judicial power of the court and upon its own motion and with the consent of all parties litigant[.]" La.R.S. 13:4165(A). In such capacity, the special master "has and shall exercise the power to regulate all proceedings before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties." La.R.S. 13:4165(B). Such duties may include making "findings of fact or conclusions of law[.]" La. R.S. 13:4165(C)(1).

2

also did not have her other medications, including her anti-depressants.

She testified that the cleanup process which she witnessed increased her anxiety and depression. She testified that the clean up after the derailment was extensive. She said the derailment caused her to have flashbacks to when her husband was hit by a train in Palmetto, Louisiana in 1996. She testified that before the derailment, she was suffering from anxiety and post-traumatic stress disorder. She testified that she used to drink the water but does not anymore because "it's still brown by times."

She testified that the derailment increased her anxiety substantially and that she was inconvenienced as a result of the derailment. She testified that she had problems before the derailment but they got worse after the derailment. She testified that her daughter, Lillian, was sleeping when she left the house after the derailment. She testified in her deposition that she was not concerned with her daughter, Lillian, at the time of the derailment because Lillian was in college. This was addressed at trial during cross-examination[.][3]

. . . .

She testified that she had a prior history, five years before the derailment, of taking anti-depressants and anti-anxiety medication. . . . She testified that although she was concerned about the water, she never had it tested or reached out to anyone in Lawtell about the quality of the water. She testified that when she went back home after the evacuation order was lifted, a representative of DEQ tested her home and said it was safe to enter.

. . . .

She testified that she did not specifically treat with a counselor in relation to the derailment. . . .

She testified that she did not see a doctor in relation to the derailment and no doctor has ever told her that any of her problems are related to the derailment. . . . Ms. Brown testified that after the derailment, her anxiety issues increased and she experienced physical symptoms such as trouble eating, trouble sleeping and weight loss and that these symptoms still exist today.

---

[3] Ms. Brown testified that she was not completely unconcerned about Lillian, but that she told Lillian not to go outside and that she would have someone get her from the house. However, as a mother, "yes, I am and was very concerned."

She drove into the town of Opelousas after the derailment occurred and called her daughter who was at home and told her about the derailment and told her to stay home. When she tried to go back home, she was then informed by a state trooper that she could not go back into Lawtell and that she had to go to the shelter at Delta, which she did. She remained at the shelter that night until they transferred her to Evangeline Downs around 10:30 p.m. on the night of the derailment.

The Special Master recommended "that the District Court find that causation and damages has been established by the plaintiff, Charlene Brown" and recommended that the trial court award Ms. Brown $5,000.00 for "Evacuation/Inconvenience[,]" $1,200.00 for "Mental Anguish[,]" and $200.00 for "Pain and Suffering" for a total amount of $6,400.00 in general damages.

Union Pacific objected to the recommendation alleging that the court should conduct a de novo review, asserting that the Special Master erred in finding causation based on Ms. Brown's self-diagnosed symptoms and that Louisiana law does not recognize a cause of action for mental anguish when there is no risk of actual harm or for negligent infliction of mere inconvenience in the absence of physical injury or property damage.

After a hearing on July 27, 2018, regarding Union Pacific's objection to the Special Master's recommendation, the trial court affirmed the Special Master's recommendation in favor of Ms. Brown, according to La.R.S. 13:4165C(3); awarded $6,400.00 plus judicial interest from the date the Petition was filed, July 11, 2014, until paid; and cast all costs, including the Special Master's fees, against Union Pacific. The trial court awarded Ms. Brown a lump sum in the amount of $6,400.00, without specifying what damages were included in the award. The trial court's judgment was signed September 6, 2018, and was designated as final and immediately appealable.

4

On appeal, Union Pacific assigns four assignments of error:

1.    The trial court erred in awarding damages to Charlene Brown for physical injuries, absent any evidence showing that the alleged damages were caused by the Lawtell Derailment or exposure to chemicals released during the Lawtell Derailment.

2.    The trial court erred in awarding damages to Charlene Brown for mental anguish, absent any accompanying physical injury or property damage.

3.    The trial court erred in awarding damages to Charlene Brown based on negligent infliction of inconvenience, absent any accompanying physical injury or property damage.

4.    The trial court abused its discretion by awarding $5,000.00 for inconvenience.

**STANDARD OF REVIEW:**

In this case, the trial judge sat as the trier of fact.[4]   On appeal, factual findings are not set aside absent manifest error or unless the trial court was clearly wrong.  *Stobart v. State, Dep't of Transp. and Dev.*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989).   To reverse a trial court's factual findings, the appellate court must apply a two-tiered test when reviewing the facts and must find that (1) the record does not establish a reasonable factual basis for the finding of the trial court, and (2) "the record establishes that the finding of the trial court is clearly wrong (manifestly erroneous)." *Bradford v. CITGO Petroleum*

---

[4] Although under the authority of La.R.S. 13:4165 the district court empowered the Special Master to make findings of fact and conclusions of law, the Louisiana constitution and laws vest the judicial power in judges to make the final determinations of fact and conclusions of law. *See Bordelon v. La. Dep't of Corrections,* 398 So.2d 1103 (La.1981).  In conformity with that mandate, La.R.S. 13:4165(C)(3) provides, in pertinent part, "After a contradictory hearing, the court may adopt the report, modify it, reject it in whole or in part, receive further evidence, or recommit it with instructions."  In the present case, the trial court affirmed the Special Master's findings of fact and conclusions of law.  Thus, the trial judge functioned as the ultimate factfinder and adjudicator of the law in this case.

*Corp.*, 17-296, p. 4 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, 658-59, *writ denied*, 18-272 (La. 5/11/18), 241 So.3d 314.  However, "[i]f the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse." *Arabie v. CITGO Petroleum Corp.*, 10-2605, p. 19 (La. 3/13/12), 89 So.3d 307, 312.  Thus, "when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous." *Id.*  This court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently.  *See generally Housely v. Cerise*, 579 So.2d 973 (La.1991).

Further, the trial court has much discretion in assessing general damages, and an appellate court should not modify the award unless it is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances[.]"  *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).  Only if the appellate court finds an abuse of discretion may it examine prior awards of general damages to determine the amount the trier of fact reasonably could award.  *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337, 1340 (La.1993).  "In instances where the appellate court is compelled to modify awards, the award will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court."  *Id.* at 1340.

**DISCUSSION:**

Before addressing the merits of Union Pacific's assignments of error, it is worth noting that a lump sum judgment of damages, as we have in this case, "is presumed to award all items of damages claimed, and the appellant's burden of

6

proving the fact finder clearly abused its great discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable." *Boutte v. Nissan Motor Corp.*, 94-1470, p. 12 (La.App. 3 Cir. 9/13/95), 663 So.2d 154, 161.

In this case, Ms. Brown's petition requests the following damages: costs of medical treatment; past, present, and future lost wages; past, present, and future mental anguish; loss of enjoyment of life; inconvenience; nuisance; medical monitoring expenses; contamination to property; trespass; and "[o]ther damages which will be shown at the trial of this matter."

Therefore, *Boutte* would suggest that we would have to find that the trial court abused its discretion in awarding Ms. Brown $6,400.00 in total for her general damages in order to reverse. Nonetheless, because the lump sum of $6,400.00 awarded for damages is the full amount that the Special Master recommended on behalf of Ms. Brown, we assume that the trial court adopted the Special Master's recommended pain and suffering, mental anguish, and inconvenience awards of $200.00, $1,200.00, and $5,000.00, respectively.

## *Recovery for Pain and Suffering:*

Union Pacific's first assignment of error argues that the trial court erred in making the factual determination that Ms. Brown suffered physical injury as a result of the train derailment.[5] Union Pacific asserts that Ms. Brown failed to

---

[5] After a review of the record, we note that the petition filed on behalf of all plaintiffs does not allege damages for pain and suffering—only for medical expenses, which Ms. Brown has none. However, the petition requests "[o]ther damages which will be shown at the trial of this matter." Therefore, we find plaintiffs petition inclusive of pain and suffering damages. Additionally, under La.Code Civ.P. art. 862, relief is granted to "the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief." In fact, Defendants did not and do not object to the pain and suffering award for the reason that it was not pled; they rely only on the argument

7

present any expert evidence to establish general or specific causation. In fact, Union Pacific argues that there is no proof regarding whether exposure to these chemicals was even possible in Ms. Brown's circumstances because the chemicals were released in liquid form and there is no evidence Ms. Brown was in the vicinity of that liquid. Additionally, there is no evidence of another pathway of exposure by which Ms. Brown might have been injured. Union Pacific asserts that temporal proximity of symptoms alone is insufficient to prove causation.

Ms. Brown counters that the Material Data Safety Sheets ("MSDS") for the chemicals contained in the train cars were admitted and that there was testimony regarding the MSDS, including an inhalation warning for sodium hydroxide solution. Ms. Brown also argues that she testified to symptoms contemporaneous with the release and that those symptoms were listed on the MSDS.

In *Arabie*, 89 So.3d at 321, the supreme court explained that "[t]he test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that the subsequent injuries were caused by the accident." In *Bradford*, 237 So.3d at 659 (citations omitted), the third circuit noted that "[p]roof of causation in toxic tort cases has two components, general and specific. 'General causation' refers to whether a substance is capable of causing a particular injury or condition in the general population, while 'specific causation' refers to whether a substance caused a particular individual's injury." Further, "cases only establish that expert testimony on causation is required." *Id.*

that Plaintiff failed to prove causation. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. . . . failure to so amend does not affect the result of the trial of these issues." La.Code Civ.P. art. 1154.

8

The Special Master provided the following pertinent Findings of Fact:

1.      A train derailment occurred on August 4, 2013 between the time of 3:20pm and 3:30pm in Lawtell, Louisiana.

2.      This derailment involved a train and tracks owned, operated and maintained by the defendant, Union Pacific Railroad Company.

. . . .

5.      As a result of this derailment, chemicals were spilled (including lube oil, dodecanol and sodium hydroxide) from some of the derailed train cars.

6.      The derailment and its resulting chemical spill and the threat of the spill was the cause of an evacuation order being issued for the residents located within an approximate one mile radius of the derailment with the center of the radius being the derailment site and thus potentially extending that distance from either end of the derailment.

. . . .

8.      After the derailment, many of the residents in areas near the derailment developed varying complaints of physical symptoms lasting for varying time periods.

Additionally, the Special Master found, and the record shows, that although air monitoring was conducted, it was not done immediately following the derailment. In fact, state police could not immediately go on the scene of the derailment due to a rain event that occurred shortly after the derailment, which hindered the response. The Center for Toxicology and Environmental Health (CTEH), hired by Union Pacific to primarily conduct air monitoring, did not have any air monitor readings before 8:00 p.m. on the night of the derailment. Further, the rain event caused "wind shifts and water to affect the spilled chemicals and led to their disbursement into the surrounding area and waterways." The rain event, as well as discharge of water by farmers, permitted chemicals to enter the drainage system and Bayou Mallet and travel approximately seven miles, which resulted in

9

the chemicals entering the property of many adjacent landowners. However, members of the response and clean-up crew testified that they did not have any symptoms when they were at the derailment site.

Specifically, as to Ms. Brown, the Special Master found and the record supports:

18. Charlene Brown was evacuated for three days as a result of the derailment.

19. Charlene Brown did not see a doctor in relation to the derailment.

20. Charlene Brown experienced burning eyes for approximately 10-15 minutes after the derailment and the burning subsided after she applied Visine.

The MSDS for lube oil, dodecanol, and sodium hydroxide solution were admitted into evidence, and Mr. Christopher Calvitt, an Environmental Scientist II and lead investigator for the Louisiana Department of Environmental Quality for this derailment, read the MSDS information as his testimony. Mr. Calvitt testified regarding the MSDS for dodecanol as follows:

Says some of the potential health effects of exposure to the eyes would be irritating to the eyes, may cause corneal inflammation, swelling of the eyes. Skin, prolonged skin contact may cause skin irritation or dermatitis. High standards of skin care and personal hygiene should be exercised at all times. Inhalation, states the irritation of nose and throat, dizziness and headache would be possible. As far as ingestion, ingestion of material would cause central nervous system depression. Ingestion may cause gastrointestinal irritation, nausea, vomiting, diarrhea. And aspiration hazard, if swallowed, can enter lungs and cause damages.

He further testified the MSDS for sulfidic caustic solution (or "sodium hydroxide solution") provides as follows:

It states the potential health effects for eye contact will cause marked eye irritation, possible severe corneal damage. Health effects to skin contact would be contact with skin will cause skin irritation or burning sensation. Prolonged contact will result in corrosion of the

10

skin. States skin absorption is unlikely to occur. Ingestion will result in severe burning, corrosion of mouth, throat, gastrointestinal tract. If the ingested material contacts stomach acid, highly toxic hydrogen sulfide will be evolved. It also states inhalation, product solution and vapors contain some highly toxic hydrogen sulfide gas. Exposure to this gas causes headaches, nausea, dizziness and vomiting. Continued exposure can lead to loss of consciousness and death.

Lastly, for lube oil, Mr. Calvitt testified that the MSDS provided:

It states depending on routes of exposure, possibly inhalation, ingestion, skin or eye contact. Of those, eyes may cause slight transient irritation, lacrimation or tears and a burning sensation in the eyes. It also states that skin may have slight - - due to exposure, may have slight irritation. Repeated and prolonged skin contact may cause reddening, itching or inflammation. Inhalation may cause - - under normal circumstances - - conditions, inhalation is not expected to be a problem. However, respiratory tract irritation may occur if exposed to fumes or mists. May cause central nervous system depression or effects. . . .

Mr. Calvitt further testified that MSDS are reviewed in situations such as this train derailment and subsequent chemical spill as a "tool to try to either identify, monitor or protect ourselves against that chemical." However, Mr. Calvitt was not an expert in this case and, therefore, could not provide any expert opinions regarding the chemicals. Mr. Calvitt further testified that he and his team only tested for certain chemicals based on what they were told had been released. Mr. Calvitt personally donned protective eyewear which protects from particulate matter, although he did not test for particulate matter.

Dr. Kelly Scribner with CTEH, testified that while no vinyl chloride was detected before its transfer into another carrier, they did find "instances of low level volatile organic compounds detected periodically throughout these documents, but none above action levels that were established for the work area or for the community." Dr. Scribner also testified that she did not specifically test for dodecanol.

11

Dr. Scribner also testified regarding the use of MSDS:

Q.    . . . So, isn't one of the purposes of MSDS to know how people - - I know it's for the industry - - but as in people, when they come in contact with these substances, what to expect?

A.    No.    They give you the potential of what could happen depending on the scenario.  It's not an indicator of expectation, but an indicator of potential.

Q.    So, it's what could happen?

A.    Yes, right.

Q.    So, what you would have to do to find out if it happened is you have to go out, and you would have to get real world evidence; is that correct?

A.    If I understand what you are saying, partially, yes.

Q.    So, you get the evidence is the smell.  MSDS says, if there is such and such release, you might smell a certain thing.  So, if that smell is consistent with what you would expect, then that would be evidence that there was that release; wouldn't it be?

A.    No, not necessarily.

Q.    That's not - - I'm not asking you if it is dispositive of the question.  I'm asking you if that would be evidence.  Would that be something that you would have to investigate?

A.    It's something you would investigate, yes.

Despite the fact that the MSDS and the Hazardous Material Response Information sheets were admitted into evidence and that evidence indicates eye burning as a potential result of the spilled chemicals, Ms. Brown did not submit any expert evidence in support of causation, general or specific.

Although Ms. Brown cites *Broussard v. Multi-Chem Group, LLC*, 17-985 (La.App. 3 Cir. 7/11/18), 255 So.3d 661, *writ denied*, 18-1347 (La. 11/14/18), 256 So.3d 258, in support of the finding of causation in this case, the plaintiffs in *Broussard* provided multiple experts who testified that the smoke plume from the

12

explosion travelled in the areas in which the plaintiffs were and that particulate matter existed for days in the air sampling data. Expert testimony regarding the risk posed by the fire's emissions was also submitted, as well as testimony of a medical doctor who explained that the type of injuries reported by the various plaintiffs more likely than not resulted from exposure to particulate matter and chemicals from the explosion.

Further, in *Arceneaux v. CITGO Petroleum Corp.*, 18-370 (La.App. 3 Cir. 1/9/19), 263 So.3d 1251, *writ denied*, 19-228 (La. 4/8/19), 267 So.3d 615, although one plaintiff, Mr. Richard, did not receive medical care, expert testimony was still provided to relate Mr. Richard's symptomology to chemical exposure, in addition to the fact that his symptoms were contemporaneous with his alleged exposure, similar to those indicated on the MSDS introduced into evidence, and similar to those symptoms experienced by other plaintiffs.

In the current case, there were no experts presented to testify on causation. Instead, Ms. Brown relies on the MSDS and the contemporaneous onset of her symptoms. Therefore, without expert testimony to relate Ms. Brown's symptoms to any particular exposure, we find that the trial court was manifestly erroneous in awarding damages for pain and suffering in this case and reduce the general damage award by $200.00.

### *Recovery for Mental Anguish Damages*:

Union Pacific argues that to receive mental anguish damages, the plaintiff must also suffer physical injury, property damage, or have special circumstances present that create a likelihood of distress, citing *Moresi v. State Through Department of Wildlife and Fisheries*, 567 So.2d 1081 (La.1990). Union Pacific first argues that pain and suffering damages were erroneously awarded to Ms.

Brown, then argues that the trial court erred in awarding mental anguish damages absent any accompanying physical injury or property damages. Further, Union Pacific argues that Ms. Brown's circumstances do not constitute "special circumstances."

In response, Ms. Brown argues that "due to the special circumstances of the plaintiff, she can recover damages with or without physical injury." She further argues that she can recover mental anguish damages due to her proximity to the event and "contemporaneous reports from reliable sources that the danger is real."[6]

In *Moresi*, 567 So.2d 1081, the plaintiffs sought "to recover on the basis that defendants' ordinary negligence caused them only mental disturbance." *Id*. at 1095. The supreme court acknowledged certain circumstances in which recovery has been permitted and noted that the commonalty between those circumstances is "the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Id*. at 1096. Furthermore, the first circuit in *McDonald v. Illinois Central Gulf Railroad Co.*, 546 So.2d 1287, 1292 (La.App. 1 Cir.), *writs denied*, 551 So.2d 1340 (La.1989), awarded damages for mental anguish where "Plaintiffs were both within the 'zone of danger[,]'" and stated that "[m]ore than minimal inconvenience and worry must be shown before damages are awarded."

In this case, the Special Master provided the following additional Findings of Fact:

> 3.  As a result of the derailment, Governor Bobby Jindal issued a proclamation declaring the area a disaster area. This was widely disseminated by the local media and news outlets.

---

[6] However, it is noted that Ms. Brown was not asked and, therefore, did not testify that she observed any of the media reports regarding the derailment.

4.  The media and local news outlets reported on the derailment and evacuation as well as the threat posed by the chemicals being transported in the rail cars.

5.  As a result of this derailment, chemicals were spilled (including lube oil, dodecanol and sodium hydroxide) from some of the derailed train cars.

    . . . .

7.  As a result of the derailment and resulting chemical spill and/or threat of chemical spill, many of the residents in areas near the derailment and evacuation area were displaced and were required to be evacuated from their homes, property and/or businesses. The result was widespread fear and fright and/or mental anguish and anxiety for many residents within the evacuation zone and extending to many residents located outside of the evacuation zone based on the perception of some residents of a real danger or threat of harm from the derailment and the cargo and contents of some of the tank cars.

    . . . .

17. The evacuation order and associated evacuation of residents was a direct result of the train derailment.

18. Charlene Brown was evacuated for three days as a result of the derailment.

Additionally, Ms. Brown testified regarding her mental anguish, which is well summarized by the Special Master above. Ms. Brown heard a loud noise and then left to run errands. In doing so, she smelled a strange odor, like acid or something burning. She passed by the scene of the derailment where she saw a fog and her eyes began burning for ten to fifteen minutes. There were no response units at the derailment site yet. After completing her errands, she was prevented from returning to her home and was sent to a shelter. She was eventually housed in a hotel without her medications. Ms. Brown made a call to have someone collect her daughter who was left at home without a car. Upon being allowed to return home on August 6, 2013, she was accompanied by DEQ personnel who took air readings of several rooms in her home prior to Ms. Brown being allowed inside.

15

Ms. Brown also witnessed the extensive cleanup that occurred. The event brought flashbacks of her husband being hit by a train. The Special Master's report stated that Ms. Brown "testified that the derailment increased her anxiety which she struggled with before the derailment. She testified that this increase in her anxiety led to physical symptoms such as trouble eating, trouble sleeping and weight loss and that these problems still exist today."

The Special Master found, and the trial court accepted, that Ms. Brown's fear was "genuine, serious and reasonable under the circumstances" and "factually distinguishable from *Moresi*[, 567 So.2d 1081]*, Bonnette* [*v. Conoco, Inc.*, 01-2767 (La. 1/28/03), 837 So.2d 1219] and *Howard* [*v. Union Carbide Corp.*, 09-2750 (La. 10/19/10), 50 So.3d 1251]." Specifically, the Special Master notes, "I find that the 'special circumstances' of a train derailment and resulting chemical spill and uncertain threat of [a] chemical spill and evacuation which occurred in close proximity to plaintiff's house are more serious and distressful circumstances than the circumstances presented in the cases of *Moresi* and *Bonnette*."

We also find *Bonnette*, 837 So.2d 1219, cited by Union Pacific, factually distinguishable because it involved claims for exposure to asbestos, and the fear of developing an asbestos related cancer, and did not involve claims for witnessing the wreckage of a train derailment, spilled chemicals, an emergency proclamation by the governor, emergency response and evacuation, and the lengthy clean-up of that derailment. Similarly, *Moresi*, 567 So.2d 1081, which involved duck hunters and a note left on the wrong camp by state game agents is also distinguishable for those reasons. After a review of the record, we agree with the Special Master's reasons for awarding Ms. Brown mental anguish damages and also find that Ms. Brown's testimony regarding the train derailment, the uncertain threat of the

chemical spill, and the evacuation that occurred within a mile of her home presents the type of special circumstances described by the supreme court in *Moresi*.

Based on these facts and the mental distress experienced by Ms. Brown, we find no abuse in the trial court's damage award, wherein we assume $1,200.00 of the lump sum award is attributable to her claim for mental anguish.

### *Negligent Infliction of Inconvenience:*

Union Pacific argues in its third and fourth assignments of error that the trial court erred in awarding damages to Ms. Brown for negligent infliction of inconvenience, absent any accompanying physical injury or property damage, and when reasonable accommodations are provided. Alternatively, Union Pacific argues that the trial court abused its discretion by awarding Ms. Brown $5,000.00 for inconvenience.

In response, Ms. Brown argues that the evacuation resulted in a "temporary deprivation" of her "legally protected interest in her home" and that her inconvenience was "severe." Ms. Brown argues that "[g]iven her inconvenience, evacuation, her proximity to the events described and the resulting complaints, which the trial court credited, the award of" damages is supported by the record.

In *McDonald*, 546 So.2d 1287, the first circuit agreed with awarding damages for inconvenience, but disagreed with the amount, where the plaintiffs were forced to evacuate following a train derailment that caused explosions and fires which damaged their property. The explosion caused a fire that blew out the front windows of the McDonalds' business, in which Mr. McDonald was working at the time. Mrs. McDonald heard the explosion but was at home when it occurred and did not witness the event. The McDonalds were forced to flee their home and

17

business for two weeks and had to live with relatives. When they could return, the McDonalds spent several weeks cleaning up the mess that was left behind.

On appeal, the first circuit found that an award for the McDonalds' inconvenience was appropriate. Specifically, the first circuit stated:

> The inconvenience he [Mr. McDonald] experienced during the evacuation is also compensable, since it is directly related to the derailment. Likewise, Mrs. McDonald is entitled to an award for inconvenience during the two weeks she was forced to stay with relatives during the evacuation. Both were forced out of their home by the derailment and were, even for another two weeks, compelled to spend all their time cleaning up their home and store.

*McDonald*, 546 So.2d at 1292 (citation omitted).

In *In re New Orleans Train Car Leakage Fire Litigation*, 00-1919 (La.App. 4 Cir. 4/20/05), 903 So.2d 9, *writ denied*, 05-1297 (La. 2/3/06), 922 So.2d 1171, the fourth circuit affirmed the finding that damages for inconvenience were appropriate for numerous plaintiffs injured by a leaking tank car fire. The defendants only challenged one of the evacuation/inconvenience awards, that of Jacqueline Thomas. Ms. Thomas "was awarded $60,000.00 for physical pain and suffering, $25,000.00 for mental anguish, and $15,000.00 for evacuation/inconvenience." *Id*. at 14. The defendants challenged the entirety of her award as being unsupported. Not only did Ms. Thomas experience physical symptoms, she was elderly and caring for five of her grandchildren. She, along with the children, evacuated to an overcrowded shelter that was unsanitary. She did not have time to pack extra clothes and, in fact, continued to wear a shirt soaked with urine because she did not have enough diapers for the baby. When Ms. Thomas returned home, she had to clean the entire house, wash all the clothes, and throw away all the food. The appellate court affirmed the award.

18

In *England v. Fifth Louisiana Levee District*, 49,795 (La.App. 2 Cir. 6/3/15), 167 So.3d 1105, the second circuit awarded damages for the plaintiffs' loss of use of property. The second circuit awarded $50.00 per day for ten days of inconvenience due to a contaminated water supply plus an additional $100.00 for direct expenses for the cost of additional water supplies. The *England* plaintiffs were forced to make trips to laundry facilities, daily trips to bathe at friends' homes, and trips to purchase bottled water. The second circuit specifically stated that "loss of use of property allows for economic recovery in tort." *Id*. at 1113.

The evidence in the record to support Ms. Brown's award for inconvenience is Ms. Brown's testimony. She testified that she was not permitted to return home to collect any belongings, including her medications, and that she was evacuated. Ms. Brown came across the derailment scene soon after it occurred, her home was within one and one-half miles from the derailment. Based on these facts, we cannot say that the trial court erred in awarding evacuation/inconvenience general damages to Ms. Brown.

However, as alternatively argued by Union Pacific, we do find that the trial court abused its discretion by awarding Ms. Brown $5,000.00 for evacuation/inconvenience where Union Pacific paid for her hotel and food costs during the evacuation and the evacuation only lasted two days.

In support of its argument, Union Pacific cites to *McDonald* and *England* to suggest that the highest reasonable award justified by this record is $50.00 per day. In *McDonald*, 546 So.2d 1287, the first circuit concluded that the highest reasonable award permissible for inconvenience, where the plaintiffs were forced to evacuate for two weeks and experienced two weeks of clean-up following a train

derailment that caused explosions and fires which damaged their property, was $5,000.00 per person for evacuation and inconvenience.

In *England*, 167 So.3d 1105, the second circuit awarded $50.00 per day for ten days for inconvenience damages due to the contaminated water supply plus an additional $100.00 for direct expenses for the cost of additional water supplies. The plaintiffs in *England* were not evacuated but were deprived of the use of water in their homes.

Additionally, the fourth circuit in *Adams v. CSX Railroads*, 01-114 (La.App. 4 Cir. 4/20/05), 902 So.2d 413, also reviewed the same leaking tank car fire involved in *In re New Orleans Train Car Leakage Fire Litigation*, 903 So.2d 9. Several plaintiffs sought review of the trial court's denial of their motion for new trial in which they alleged there was no factual basis to support the low damages awarded by the jury. On appeal, only one plaintiff's evacuation/inconvenience damage amount was challenged, that of Sandra August, who received $200.00 for physical pain and suffering as well as $500 for evacuation/inconvenience.[7] Ms. August evacuated her home in the morning and returned home the following day. She suffered from "eye, nose and throat irritation for two days[.]" *Id*. at 417. The fourth circuit found no abuse in discretion of the $500 awarded for Ms. August's evacuation and inconvenience.

In this case, the only inconvenience suffered by Ms. Brown was having to leave her home for forty-eight hours without collecting any of her belongings. There is no evidence that she had to endure any particular hardship, especially

---

[7] Shunta Dickerson was awarded $100 for "evacuation *expenses*[,]" but those damages were not listed as "evacuation/inconvenience" damages as were Ms. August's damages. *Adams*, 902 So.2d at 417 (emphasis added).

considering that Union Pacific paid all expenses for room and board. Although the courts in *In re New Orleans Train Car Leakage Fire Litigation* and *McDonald* support high awards for inconvenience damages, we find these cases distinguishable based on the fact that the plaintiffs in those cases suffered either physical injuries and/or property damages along with their inconvenience damages.

However, we also find the *England* case distinguishable from the facts of this case because unlike Ms. Brown, the plaintiffs in *England* were not asked to evacuate and were not displaced from their homes. Instead, Ms. Brown was deprived of the full use and convenience of her home during the evacuation.

Accordingly, based on these facts where Ms. Brown was provided all expenses for room and board, and did not suffer any physical or property damage, we find that the trial court's award of $5,000.00 for evacuation/inconvenience was beyond that which a reasonable trier of fact could assess for inconvenience damages to Ms. Brown under these circumstances.

Thus, we hereby amend the evacuation/inconvenience damage award to the highest damage award for inconvenience supported by the record, $500.00 per day. Although the Special Master's report states that Ms. Brown was evacuated for three days, the evidence shows that the derailment occurred roughly at 3:30 p.m. on August 4, 2013. Ms. Brown was permitted to return home some time on August 6, 2013, which is the date she signed the Home Re-Entry Form. The records from Evangeline Downs also show Ms. Brown checked out on August 6, 2013, around midday. Thus, we hereby amend the evacuation/inconvenience award to $1,000.00.

**CONCLUSION:**

After a review of the record, we find that the trial court erred in awarding general damages for pain and suffering, based on its adoption of the Special Master's report, and delete that award. We also amend the trial court's evacuation/inconvenience damage award to $1,000.00. Thereafter, we affirm the trial court's mental anguish award of $1,200.00, for a total award of $2,200.00 in general damages to Charlene Brown and against Union Pacific Railroad Company. Costs of this appeal are assessed one-half to Charlene Brown and one-half to Union Pacific.

**AMENDED AND, AS AMENDED, AFFIRMED.**